CHARLES D. CANTERBURY AND DIANE M. CANTERBURY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 38037–87, 31477–88, 31478–88, 31479–88, 10551–89, 13576–89, 14540–89, 14849–89, 15037–89, 15038–89, 16033–89.

Filed August 17, 1992.

---

[1] Cases of the following petitioners are consolidated herewith: T.P. Corp., docket No. 31477-88; T.C.K.S., Inc., docket No. 31478-88; Shoff-Athens, Inc., docket No. 31479-88; Joseph R. Benden and Rose Ann Benden, docket No. 10551-89; Samuel Whiting and Susan R. Whiting, docket No. 13576-89; Lloyd J. Morris and Melissa S. Morris, docket No. 14540-89; Stanley N. Fiddelke and Alene T. Fiddelke, docket No. 14849-89; Philip L. Palumbo and Joanne M. Murphy, formerly Joanne M. Palumbo, docket No. 15037-89; John E. Ryal III and Barbara L. Ryal, docket No. 15038-89; and Richard L. Adams and Paula L. Adams, docket No. 16033-89.

*N. Jerold Cohen* and *J.D. Fleming, Jr.,* for petitioners.
*Jack E. Prestrud* and *J. Scott Broome,* for respondent.

RUWE, *Judge:* Petitioners are McDonald's franchisees in the San Diego, California, and Cleveland, Ohio, areas. Petitioners each acquired their franchises as part of the purchase of an existing McDonald's restaurant operation from either a McDonald's franchisee or from one of McDonald's wholly owned subsidiaries, collectively referred to as McDonald's Operating Co. (McOpCo).[2] These purchases were made during the period 1972 to 1984. Petitioners each allocated a portion of the purchase price to the tangible assets which they purchased. They allocated the remaining purchase price to the McDonald's franchise and deducted a portion of that amount pursuant to section 1253(d)(2)(A).[3]

The parties agree that petitioners properly identified and valued the tangible assets associated with each restaurant and that the remainder of the purchase price is allocable to intangible assets. The parties also agree that the amounts properly allocable to the franchises are amortizable under section 1253(d)(2)(A); the parties disagree over what that amount is. We must decide what portion of the purchase price of each McDonald's restaurant is to be allocated to the franchise for purposes of amortization under section 1253(d)(2)(A).[4]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first and second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

---

[2] McOpCo is actually a separate franchisee, and as such, it executes a franchise agreement with McDonald's for each restaurant containing the same terms and conditions as franchise agreements with other franchisees. Since 1979, McOpCo has operated between 20 and 25 percent of total McDonald's restaurants in the United States.

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue (1980 through 1986), and all Rule references are to the Tax Court Rules of Practice and Procedure.

[4] Some of the individual cases involve separate substantive issues. The parties have stipulated that to the extent there are other issues involved in the individual cases, the parties will endeavor to settle those issues and a separate trial of those issues will be held if settlement is not possible.

Respondent concedes that petitioners' amortization deductions were not due to negligence or intentional disregard of rules and regulations.

A McDonald's franchise encompasses the rights to occupy and operate a McDonald's restaurant at a specific location owned or controlled by McDonald's Corp., to utilize all attributes of the McDonald's system, including the trademarks and other identifying features which belong to McDonald's Corp., and to receive ongoing advice and support from McDonald's Corp. with regard to the McDonald's restaurant business, in return for the payment of certain fees and conformance with certain rules established by McDonald's Corp. The franchise agreement between McDonald's and the franchisee is embodied in the franchise letter agreement to which a license agreement and an operator's lease are attached and incorporated by reference. The license agreement and operator's lease for a restaurant are always for the same term.

The following table identifies the McDonald's restaurants that petitioners purchased, the date of purchase, the purchase price, and petitioners' allocation of the purchase price between tangible assets and the franchise.

| Restaurant location | Purchase date | Purchase price | − | Tangible assets | = | Franchise value |
|---|---|---|---|---|---|---|
| Clark Ave., Cleveland, Ohio | 4/15/78 | $453,418 | | $52,951 | | $400,467 |
| Detroit Ave., Cleveland, Ohio | 4/1/79 | 450,000 | | 65,072 | | 384,928 |
| Mayfield Rd., Mayfield Hts., Ohio | 7/1/79 | 460,000 | | 72,100 | | 387,900 |
| Richland Ave., Athens, Ohio | 6/30/72 | 330,000 | | 120,000 | | 210,000 |
| Bealle Ave., Wooster, Ohio | 11/21/75 | 398,351 | | 78,439 | | 319,912 |
| High Street, Wadsworth, Ohio | 11/21/75 | 564,851 | | 127,160 | | 437,691 |
| Mira Mesa Blvd., Mira Mesa, Cal. | 12/22/80 | 398,422 | | 74,000 | | 324,422 |
| Cuyamaca St., Santee, Cal. | 9/30/78 | 340,000 | | 80,000 | | 260,000 |
| Lake Murray Blvd., San Diego, Cal. | 12/1/81 | 324,750 | | 290,000 | | 34,750 |
| Garnet Ave., San Diego, Cal. | 10/31/78 | 235,000 | | -0- | | 235,000 |
| Broadway, Lemon Grove, Cal. | 12/29/81 | 365,000 | | 125,000 | | 240,000 |
| Fletcher Pkwy., El Cajon, Cal. | 3/31/82 | 272,372 | | 110,259 | | 162,113 |
| Mira Mesa Blvd., Mira Mesa, Cal. | 1/31/83 | 734,743 | | 53,000 | | 681,743 |
| Main Street, Ramona, Cal. | 12/31/84 | 386,717 | | 181,786 | | 204,931 |

| Restaurant location | Purchase date | Purchase price | − | Tangible assets | = | Franchise value |
|---|---|---|---|---|---|---|
| Cuyamaca St., Santee, Cal. | 1/23/83 | 473,605 | | 76,629 | | 396,976 |
| Lake Murray Blvd., San Diego, Cal. | 1/21/83 | 346,180 | | 93,781 | | 252,399 |

## I. *The History and Philosophy of McDonald's Franchising System*

McDonald's Corp. (McDonald's or the company) was started by Ray Kroc in 1955. Prior to beginning the company, Mr. Kroc observed the restaurant franchising industry first hand as a vendor for multimixer malt machines. Mr. Kroc believed that the restaurant franchising industry was flawed in a number of respects. The most serious flaws stemmed from the franchisors' focus on quick up-front profits that resulted in the franchisors' failure to work for the long-term success of their franchisees. The restaurant franchising industry was in the practice of charging significant up-front franchise fees for large territorial franchises while, at the same time, assuming few, if any, ongoing obligations toward the franchisees after the sale. Mr. Kroc felt that when a franchisor made significant profit prior to a restaurant's opening, there was little incentive to oversee or monitor its franchisees' operations.

Mr. Kroc also believed that high up-front franchise fees could prevent franchisees from making a reasonable profit. The initial franchise fee charged by McDonald's was $950 until 1960, $12,500 between 1960 and 1987, and $22,500 since 1987. McDonald's has not increased its initial franchise fee to reflect increased sales. For instance, while the franchise fee remained $12,500 between 1960 and 1987, the average gross sales of McDonald's restaurants in those years rose from $249,099 to $1,350,000.

Another problem Mr. Kroc perceived with the restaurant franchising industry was the franchisor's practice of requiring the franchisee to buy equipment and products from the franchisor. Mr. Kroc believed that the franchisor created a conflict by profiting from the sale of goods to franchisees. In addition, Mr. Kroc felt that the practice of selling to franchisees encouraged franchisors to concentrate their efforts on equipment and product sales rather than on the

performance of their restaurants. Consistent with this belief, McDonald's has never sold equipment or products to its franchisees.

Mr. Kroc believed that the sale of territorial franchises would lead to loss of control over the quality of McDonald's restaurants. If a marginal or poor franchisee operated numerous McDonald's restaurants in a given area, the impact on the company and its other franchisees would be magnified and could be disastrous. Since 1969, every franchise granted has been limited to operations at a specific street address. By franchising one restaurant at a time (as opposed to granting territorial franchises), McDonald's has retained the right to choose the franchisee who operates each restaurant, without limiting its opportunity to expand in a given geographical area.

When Mr. Kroc opened the first McDonald's restaurant in Illinois in 1955, he had in mind the type of person he wanted to become partners with and whom he hoped to attract to the McDonald's franchising system (the system). Mr. Kroc believed that the company's success depended upon its franchisees' being hands-on operators who would expect to earn their livelihood at the business and devote full time to protecting their investments. Those willing to give up their jobs, invest their life savings, and borrow money for the chance to own their own businesses would also be willing to devote the time necessary to run a profitable McDonald's restaurant. The people Mr. Kroc sought were not wealthy investors. McDonald's maintains a corporate policy requiring its franchisees to be hands-on operators, rather than passive investors.

Mr. Kroc believed that he could establish a restaurant-franchising system that would succeed where others had failed. Central to his vision were the concepts that McDonald's would enter into a mutually beneficial relationship with each of its franchisees to strive for uniformity and quality in food products and service, and that if its franchisees became financially successful, McDonald's success would follow.

## II. *The McDonald's System*

### A. *An Overview*

McDonald's is the exclusive owner of the McDonald's system, the trade name McDonald's, the Golden Arches trademark, and all other trademarks, service marks, and other intellectual property rights associated with McDonald's restaurants.[5] The McDonald's system is a comprehensive and detailed plan for operating a McDonald's restaurant and includes:

a. Site selection and construction of the physical plant;
b. designs and color schemes for the restaurant and signs;
c. owner/operator, manager, and crew training;
d. equipment layouts;
e. food formulas and specifications;[6]
f. operation specifications, assistance, and monitoring;
g. inventory accounting and bookkeeping methods;
h. product research and development; and
i. advertising and promotional materials.

Under the franchise arrangement between McDonald's and its franchisees, the franchisees are obliged to adhere to all aspects of the McDonald's system during the terms of their franchises.

### B. *Site Selection and Construction of the Physical Plant*

Since the 1950s, McDonald's has believed that it could better control its destiny if it purchased or leased the sites for new restaurants, constructed the restaurants, and then leased the restaurants to franchisees. McDonald's develops new restaurants in accordance with a master growth plan, which is developed at the regional level and approved by central management.

After deciding to build a new restaurant, McDonald's real estate specialists search for appropriate restaurant sites in the region. The real estate specialists consider factors such as population density, traffic patterns, market statistics, proximity of shopping centers, schools and competing res-

---

[5] McDonald's prohibits franchisees from using their name in the operation, advertisement, or promotion of the franchise. Only the name McDonald's may be used in conjunction with the operation, advertisement, or promotion of a McDonald's franchise.

[6] A franchisee must serve only those food items specified by McDonald's.

taurants, accessibility of utility and public services, and ease of access to foot and auto traffic in determining whether a particular site is appropriate. Sites are selected to minimize competition with existing McDonald's restaurants. Based on their analysis, McDonald's real estate specialists are able to predict with great accuracy whether a restaurant will succeed at a particular site.

Once McDonald's regional management approves the site selected by the real estate specialists, it then decides the type of building to erect on the site. Although most McDonald's restaurants bear the same distinctive features, such as the Golden Arches motif, brick and glass construction, and the mansard roof line,[7] differences such as lot size and shape, projected market size, land elevation, sign restrictions, store visibility, and set-back requirements influence the exact restaurant structure that is ultimately erected. For instance, projected market size influences dining room size, and lot size and shape affect store and parking lot configurations. McDonald's has several building plans from which it chooses when deciding the type of structure to build on a particular site. The plans are very detailed and complete. The plans are the product of McDonald's experience in building restaurants.

It is McDonald's policy to purchase or lease the land for each of its new restaurants and construct the buildings and site improvements, such as parking lots, grading, and utility hookups. The buildings contain no kitchen equipment or dining room furnishings. Except in the case of a business facilities lease, discussed *infra,* the franchisee is responsible for equipping and furnishing the restaurant. McDonald's provides the specifications and a list of approved equipment suppliers to the franchisee.

McDonald's and the franchisee execute an operator's lease under which McDonald's grants the franchisee the right to use the restaurant premises during the term of the franchise. McDonald's charges its franchisees both monthly rent and a service fee for which McDonald's provides considerable assistance to its franchisees during the operation of their franchises. McDonald's believes that this assistance ensures

---

[7] These features identify the store as a McDonald's restaurant, even where zoning restrictions preclude other advertising or signs.

that its franchisees maintain uniform standards and protects the integrity of the entire franchise system. Between 1982 and 1985, the license agreement executed by McDonald's and its franchisees obligated a franchisee to pay McDonald's 3 percent of total gross sales per month in consideration of the ongoing services provided by McDonald's, while the operator's lease required a minimum percentage rental payment of 8.5 percent of gross sales per month.[8] In the rare instances in which a McDonald's restaurant does not meet expected sales volume, McDonald's will assist the operator by providing a reduction in the monthly rental payments.

### C. *Application and Training for a Franchise*

McDonald's franchise applicants go through a rigorous selection process and training program prior to becoming eligible to obtain a franchise. Applicants initiate the selection process by submitting a written application to the regional office. The regional licensing manager reviews completed applications and invites promising candidates for a personal interview to further assess their potential as a franchisee. McDonald's believes that the following qualifications, among others, are essential: Entrepreneurial spirit, a strong business background, willingness to devote full time to the restaurant, and willingness to participate in the 2-year training program. Also, McDonald's generally requires prospective franchisees to meet certain minimum financial requirements.[9]

Applicants who satisfy the requirements of the initial screening and interview are subjected to an on-the-job evaluation in which the applicant works in a McDonald's restaurant for a short period of time, typically 2 or 3 days. This gives McDonald's the opportunity to evaluate applicants in a restaurant environment and also gives the applicant an opportunity to obtain greater familiarity with McDonald's. After the on-the-job evaluation, if both McDonald's and the

---

[8] Petitioners provided testimony which indicated that the amount charged under the operator's lease exceeded the fair rental value of the premises leased. Respondent apparently accepts this testimony. Respondent does not allege that any separate leasehold value was acquired by petitioners in these cases.

[9] In meeting these requirements, prospective franchisees may rely only on personal resources, since McDonald's does not permit inactive partners or investors.

applicant agree, the applicant enters the formal training part of the application process.

Formal training consists of a 2-year training and evaluation program in which applicants typically work 15 to 20 hours a week, without compensation, either in McDonald's restaurants or attending McDonald's training courses. McDonald's devotes significant time and resources to its highly regarded training program. The program is designed to educate applicants in all aspects of operating a McDonald's restaurant and evaluate their potential as a franchisee. The training program proceeds in several phases.

In the first phase the applicant works at a McDonald's restaurant and obtains hands-on experience with the daily operations of the restaurant. The applicant typically participates in crew jobs (i.e., basic food preparation, waiting on customers, etc.) and progresses to management activities. Applicants receive a manual, "Management Development Program Volume I", which provides basic training on various topics related to operating a McDonald's restaurant. In addition, they receive an operations and training manual, which covers the details of each operation done in the store. The operations and training manual provides the basic standards of quality, service, and cleanliness (QSC), which are an essential foundation of the McDonald's system. The first phase usually lasts from 6 to 9 months and involves several hundred hours of uncompensated work and culminates in a week-long course (the basic operations course), which is held at the regional office. This course covers the basic subjects of operations, including quality, service, sanitation, training, personnel, opening and closing the store, floor control, and basic maintenance.

After the initial phase is successfully completed, the applicant is interviewed by McDonald's regional licensing manager to determine whether to register the applicant. If the applicant is approved, he pays a $4,000 deposit and is placed on the registered applicants list. The registered applicant continues to work, without compensation, in a McDonald's restaurant and continues the formal training program.

"Management Development Program Volume II" accompanies the second phase of the training program. This phase focuses on further development of basic management skills.

Covered subjects include: Recruiting, interviewing, and hiring employees; orientation and training of new employees; inventory control; operations reporting; equipment and utility maintenance; labor control; and time management. During this phase, the registered applicant also completes the licensee accounting and financial development program. In this program, the registered applicant receives instruction on bookkeeping, accounting and tax information, the financial statements used in a McDonald's restaurant, the significance of these statements, and the franchisee's role in the preparation and use of the statements. The second phase culminates in a second 1-week course at the regional office known as the intermediate operations course.

"Management Development Program Volume III" accompanies the third phase of training. This phase continues to expand the coverage of managerial issues in greater detail. Topics include: Planning and scheduling, use of profit and loss statements, energy management, crew recruitment, people management, administration and development of managers, store security, and sales building. The registered applicant also takes a 1-week applied equipment course at the regional office, which covers all aspects of equipment operation in a McDonald's restaurant.

After completing the third phase of the training program, the registered applicant attends a 2-week advanced operations course. This course is held on the campus of Hamburger University, a sophisticated $40 million training facility located at McDonald's headquarters in Oak Brook, Illinois. Hamburger University was established in 1963 and currently has the enrollment capacity of 750 students. Hamburger University has a 30-member faculty, each of whom has worked for a number of years in a McDonald's restaurant. Hamburger University is the only school in the quick-service restaurant industry that offers courses that are university accredited. The advanced operations course at Hamburger University concludes the required formal training program.

The McDonald's training program is comprehensive, covering all aspects of the McDonald's system in detail. The program includes seminars, conferences, and one-on-one sessions with McDonald's corporate personnel, as well as considerable independent study and hundreds of hours of hands-on train-

ing in a McDonald's store. By carefully screening prospective franchisees and rigorous training and indoctrination into the McDonald's system, McDonald's assures that its franchisees will be highly motivated individuals who fully understand the McDonald's system and are capable of applying it in their franchised operations.

After completing the formal training program, applicants and managers continue to receive additional training as they continue to work with McDonald's. For example, "Management Development Program Volume IV" assists in the transition to store manager, as well as assists owner/operators in training their store managers. It includes a 9-month series of planned activities, which provide further development of management skills. It also includes a practical section for problem solving, as well as a section entitled "Green and Growing", which provides avenues for further education and contributes to the continued development and understanding of the McDonald's system.

McDonald's continues to provide resources for ongoing training and assistance to franchisees and their employees throughout the period of operation of the restaurant. Adherence by the franchisees and their employees to the methods of the McDonald's system ensures uniformity, which, among other things, attracts customers to McDonald's restaurants.

### D. *Product and Equipment Research and Development*

Mr. Kroc believed from the inception of the company, and extensive experience has confirmed, that McDonald's restaurants would achieve the desired level of uniformity and high quality only if McDonald's provided its franchisees with detailed specifications for each food item served, and assumed the responsibility of locating food and equipment suppliers that would adhere to McDonald's standards. Early McDonald's restaurants had a 10-item menu, with its most popular meal consisting of a hamburger, french fries, and a milkshake. McDonald's set out to develop these food items in such a way that they could be consistently produced by its franchisees. Illustrative of this process is the extent to which McDonald's went to find a way to consistently produce crisp, golden french fries and which ultimately led to changes in the potato-growing industry.

In its first 10 years of business, McDonald's spent about $3 million on developing its french fries. This included extensive field and laboratory research to determine the optimum temperature and time for cooking and the precise level of sugar, starch, and solids content that would optimize the texture and quality of the product. McDonald's invented an electrical sensor that determined when a batch of french fries was perfectly cooked. The "potato computer" was installed in each store and successfully automated the cooking of french fries.

The attention McDonald's paid to the production of french fries was repeated for hamburgers. McDonald's and its franchisees are collectively the largest purchaser of beef in the United States. Its purchasing power influenced changes in the meat industry, and McDonald's set the toughest specifications the meat industry had ever known. McDonald's ensures that beef suppliers live up to its specifications through its own inspections of the meat provided by its suppliers. McDonald's also advises its franchisees to analyze the meat it receives and devised a 50-item meat test for its franchisees and trains its franchisees to grill samples from each delivery.

The care taken in researching product specifications and composition is reflected in the "Operations and Training Manual", which sets forth detailed specifications for preparing each food item on its menu. The manual identifies and explains in detail each and every step in the preparation process. It covers basically everything from storing the food supplies upon delivery to presentation of the final product to the customer. The manual also covers aspects of production such as "French Fry Troubleshooting Guidelines", maximum holding times for food items, packaging guidelines, and directions for cleaning the equipment used in food production. Color photographs are included to show the correct way to assemble every breakfast, salad, and sandwich McDonald's offers, right down to how "red" a tomato should be before use. By way of illustration, the chapter in the 1988/1989 manual[10] on "Hamburgers" is 32 pages long and covers

---

[10] The Operations and Training Manual is constantly revised and updated; it is reprinted in full every 2 years. Interim manual chapters are developed when changes to operational procedures are required, as well as when new products are introduced to the system.

everything from the placement of meat patties on the grill to application of the mustard, catsup, and pickle.

Because of McDonald's restaurants' high sales volume, McDonald's found traditional equipment to be almost useless. McDonald's is actively involved in designing the equipment for its restaurants and designed the first equipment package tailored for the restaurant franchising business. Worldwide, McDonald's employs more than 200 engineers for the purpose of testing, designing, and troubleshooting equipment and systems used in McDonald's restaurants.

McDonald's requires its franchisees to purchase supplies from suppliers approved by McDonald's. In determining whether to approve a supplier, McDonald's purchasing department considers the supplier's: (1) Ability to manufacture products to McDonald's standards; (2) agreement to offer McDonald's franchisees discount prices; (3) willingness to protect McDonald's confidential information; and (4) capability of meeting supply commitments. Approved suppliers must maintain their standards in accordance with McDonald's specifications, and any uncorrected deviation results in termination of approved-supplier status.

McDonald's specifications for food quality and preparation are of critical importance to the success of its restaurants, since they ensure that uniformly high-quality food is served at all McDonald's restaurants. The McDonald's license agreement expressly provides that franchisees will use "only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's system specifications and quality standards", and that they will "employ only those methods of food handling and preparation" designated by McDonald's. Further, the food can only be served with packaging, napkins, and similar paper goods that meet McDonald's system specifications and bear the appropriate McDonald's trademarks.

McDonald's continually researches and develops new food items and equipment in its research and development laboratory near its corporate headquarters in Oak Brook, Illinois.

E. *Operation Specifications, Assistance, and Monitoring*

Every component of the McDonald's system is important to the operation of a restaurant, and McDonald's insists on

strict compliance with its specifications or standards. These specifications or standards are frequently referred to as QSC—quality, service, and cleanliness. McDonald's ensures compliance with the system's specifications and standards for QSC through monitoring the day-to-day operation of its restaurants. McDonald's records the results of its monitoring of a particular store's operations by grading operations (A, B, C, D, or F) in four categories: Quality, service, cleanliness, and overall performance. In addition to determining whether a franchisee is complying with McDonald's specifications, McDonald's uses the grading system in deciding whether to grant additional franchises to a franchisee.

The McDonald's field service consultant is responsible for grading a restaurant's operations as well as for consulting with, and troubleshooting for, McDonald's franchisees in such areas as crew training, procuring suppliers, and improving restaurant operations. The field service consultant is a specialist in evaluating McDonald's restaurants to identify operating deficiencies and to work with the franchisee to correct them. Between 1982 and 1985, McDonald's employed nearly 300 field service consultants who regularly visited each of the restaurants for the purpose of monitoring compliance with the system and assisting franchisees and their employees in implementing the system.

McDonald's field service consultants conduct frequent informal inspections and an annual full field inspection.[11] During the full field inspection, the consultant and the store's manager complete a 27-page full field inspection and consultation form, which evaluates the store on more than 500 items, including the taste and appearance of each food product, adherence to preparation procedures for each menu item, whether proper quality, handling, and storage standards for raw materials are being met, and whether equipment is calibrated properly and operating in accordance with system specifications. McDonald's spent about $19 million in 1985 on its field service operation.

The importance of compliance with system standards for QSC and the uniformity that it generates among restaurants

---

[11] In addition to visits by field service consultants, others in the McDonald's system, including high-level management, regularly pay informal visits to franchises. These informal, unscheduled visits reinforce the importance of consistent adherence to the standards prescribed by the system.

is also reflected in the previously mentioned training and instruction materials provided to franchisees. These materials are detailed, exhaustive, and comprehensive. The standards they establish are objective and leave nothing to chance.

McDonald's also provides its franchisees with the McDonald's statistical report, which allows a store manager to compute the number of products yielded by a given quantity of raw material. McDonald's has computed a small range of recommended yields for each product. For example, every gallon of milkshake mix should produce between 15.2 and 15.6 shakes. By comparing the store yield with recommended yields computed by McDonald's, McDonald's can identify nonconformity and rectify the problem. These reports are prepared every month and submitted to the regional office for review. This provides an additional means for the regional office to monitor compliance with system standards.

In addition to monitoring operations for the purpose of grading stores, field service consultants also provide expert business advice to the franchisees with regard to any aspect of the McDonald's system, including marketing, training managers and crew, reinvestment in upgrading store property, and QSC. The training, monitoring, management resources, and ongoing assistance to franchisees from McDonald's is an integral part of the McDonald's system, and each franchisee obtains these as part of the franchise. This assistance ensures a high level of compliance with the system specifications, which produces consistency and uniformity among restaurants. Such consistency and uniformity is essential to McDonald's success.

## F. *Advertising and Promotion*

Each McDonald's franchisee is required to participate in, and is entitled to the benefits of, McDonald's advertising and promotional programs. Franchisees are required to spend no less than 4 percent of the gross sales per year of each restaurant to promote the restaurant. Two percent goes to the franchisees' local advertising cooperative,[12] and 2 percent goes to the Operator's National Advertising (OPNAD) fund for national advertising, which was created in 1966. In 1985,

---

[12] Currently, there are 167 local advertising cooperatives' employing 65 independent ad agencies. Local advertising cooperatives run in their own markets the successful promotions developed by other local co-ops, spreading the promotion throughout the McDonald's system.

OPNAD spent $180 million for television advertising and the local advertising cooperatives spent $122 million, for a total of $302 million spent on television advertising in 1985, the largest television advertising budget in the United States to promote a single brand.

McDonald's corporate marketing department oversees the production of about 130 new television commercials per year which cost approximately $20 million annually. Twice a year, McDonald's advertising executives meet with the principals of more than 60 ad agencies, along with members of the OPNAD committee, to review current and new marketing ideas. In addition, McDonald's meets yearly with the presidents of the 167 local advertising cooperatives to discuss an annual marketing plan and budget. The marketing plan identifies the timing of 8 to 10 promotional programs. Because local participation is optional, McDonald's marketing department advises the local co-ops of the upcoming programs and requests a participation commitment by a certain date.

### III. *McDonald's Operating Company Restaurants*

In 1959, McDonald's took over the operation of one of its restaurants from a franchisee, and the next year McDonald's opened four new company-owned and managed stores. In 1985, McDonald's wholly owned subsidiaries, collectively referred to as McOpCo,[13] operated 1,470 of the 6,620 operating McDonald's restaurants in the United States. One of McDonald's objectives in owning and operating McDonald's restaurants is to provide adequate opportunities for training its franchisees and managers. Owning and operating restaurants also enables McDonald's to monitor trends in the market and to provide access to markets where it can develop, promote, and test new food products and equipment. McDonald's also generates a profit from the operation and sale of its restaurants.

### IV. *The Ways To Obtain a McDonald's Franchise*

McDonald's franchises are in great demand. Only about 1 percent of the persons inquiring about franchisee opportunities ultimately obtain a franchise, and less than 10 percent

---

[13] See *supra* note 2.

of those who go through the process of filing a lengthy written application actually obtain a franchise. An individual may obtain a McDonald's franchise one of three ways: (1) Acquire a new restaurant from McDonald's; (2) acquire an existing restaurant from another franchisee; or (3) enter into a business facilities lease arrangement with McDonald's.

## A. *Acquisition of a New Restaurant*

Whether a registered applicant or an existing franchisee can obtain a new restaurant depends primarily upon availability. Disposition of new restaurants among registered applicants (new franchisees), McOpCo, and existing franchisees during 1982 to 1985 were as follows:

| Year | New franchisee | Existing franchisee | McOpCo |
|------|----------------|---------------------|--------|
| 1982 | 50 | 228 | 109 |
| 1983 | 42 | 221 | 92 |
| 1984 | 42 | 232 | 92 |
| 1985 | 48 | 263 | 105 |

From 1980 to 1990, new franchisees received 12.9 percent of new restaurants, existing franchisees received 61.5 percent, and McOpCo received 25.6 percent.

McDonald's makes no commitment to provide a registered applicant with a new restaurant, and McDonald's will not award an additional franchise to an existing franchisee unless the franchisee has demonstrated a favorable "track record" in operating a previously franchised restaurant. McDonald's uses the prospect of receiving new restaurants to motivate its franchisees to adhere to its strict policies and standards regarding the operation of its restaurants.

McDonald's has filed uniform franchise offering circulars (UFOC's) with the Federal Trade Commission and various State regulatory agencies since 1979. According to these circulars, during the years 1979 to 1985, a new franchisee could expect to incur the following costs in connection with opening a new McDonald's restaurant: License fee ($12,500); deposit to McDonald's ($15,000);[14] equipment, fixtures, and other fixed assets (between $160,000 to $300,000); initial

---

[14]This deposit is a noninterest-bearing, refundable, security deposit. It is used by McDonald's to cover any potential delinquent receivables from the franchisee or to pay for repairs or maintenance necessary if the lease terminates. Any part of the security deposit which is unused is refunded to the franchisee at the end of the lease term.

inventory (between $6,000 to $18,000); and working capital, prepaid expenses, opening expenses, miscellaneous equipment, etc. (between $45,000 to $65,000).

The preopening expenses incurred in connection with a new McDonald's restaurant include management and crew wages incurred during training. Management training generally takes about 8 weeks, and crew training generally takes 2 to 3 weeks, with crew involvement on a part-time basis. If the franchisee has other restaurants, he will usually train crew members in these restaurants. New franchisees who do not have other restaurants frequently use other franchisees' (including McOpCo's) restaurants for training. If no other restaurant is available, new franchisees may use "dry runs" in the new restaurant. If necessary, McDonald's will bring in employees (at the franchisee's expense) from other restaurants to get the new restaurant up and running. A crew can be assembled on very short notice, even as little as 1 day. McDonald's field service consultants work with the franchisee to assure that the new store has a properly trained management and crew.

Although McDonald's does not compile statistics on crew turnover for its non-McOpCo franchisees, its records of employee turnover[15] at its McOpCo restaurants for the period 1986 through 1989 are as follows:

|  | 1986 | 1987 | 1988 | 1989 | Average |
|---|---|---|---|---|---|
| National | 224% | 207% | 203% | 189% | 205.75% |
| San Diego | 246 | 298 | 246 | 212 | 250.62 |
| Cleveland | 180 | 170 | 184 | 153 | 171.75 |

These figures are representative of the turnover occurring at other McDonald's franchises. For the pertinent periods prior to 1986, the respective average turnover rates shown above for the Cleveland and San Diego regions are representative of the crew turnover rates at restaurants in those regions.

Because of McDonald's experience in opening new restaurants, its franchisees are able to minimize many of the costs that a new restaurant typically incurs in the early phases of operation. For instance, because McDonald's provides its franchisee with a list of approved suppliers, supply

---

[15] The turnover rate is computed by dividing the total number of crew employees hired during the calendar year by the total number of crew positions.

networks for new stores are established with minimal effort. Also, field service consultants work with franchisees to assure that adequate inventories, equipment, and supplies are in place prior to opening. McDonald's reputation, its careful selection of the restaurant site, and the active promotion of a new restaurant's opening, ensure that customers will patronize the new restaurant from the day it opens. McDonald's widely publicizes the opening of a new restaurant prior to the commencement of operations, and a "grand opening" event, which may include an appearance by Ronald McDonald, is often held to further publicize the new restaurant. The franchisee bears the cost of such grand-opening advertising.

McDonald's requires that a prospective purchaser be able to generate a projected minimum cash-flow from the restaurant that will be sufficient to cover debt service and to provide a "living wage". This minimum cash-flow "hurdle" is imposed regardless of whether the purchaser is buying his first McDonald's restaurant, or an additional restaurant.

Based on the demographic data accumulated in connection with the site selection process, the McDonald's regional office projects an expected sales volume for the new store. McDonald's expects a new store to meet or exceed this projected volume almost immediately after opening. Typically, a new store will meet its projected annualized volume level within the first week of operation.

## B. *Acquisition of an Existing Restaurant*

Prospective franchisees frequently buy existing franchises from other franchisees or McOpCo. Between 1982 and 1985, acquisitions of existing restaurants by new franchisees, existing franchisees, and McOpCo were as follows:

| Year | New franchisee | Existing franchisee | McOpCo |
|------|---------------|---------------------|--------|
| 1982 | 69 | 150 | -0- |
| 1983 | 93 | 242 | 13 |
| 1984 | 61 | 122 | 3 |
| 1985 | 102 | 232 | 59 |

Between 1980 and 1990, new franchisees purchased or leased an average of 29.4 percent of the existing restaurants traded, existing franchisees purchased or leased 63.3 percent, and McOpCo purchased 7.3 percent. When McOpCo or another

franchisee sells an existing McDonald's restaurant, McDonald's retains ownership of the land, building, and site improvements. The franchisee purchases only the equipment, the inventory, and the right to operate the McDonald's system at that particular restaurant location. If the purchasing franchisee is buying from an independent franchisee, the purchaser typically operates the restaurant under the existing franchise agreement for the remaining term of the agreement. If the franchisee is buying a McOpCo franchise, McDonald's typically executes a new franchise agreement with the purchaser for a 20-year period.

Although buying a new franchise is typically less expensive, the decision to purchase a franchise for a new restaurant versus an existing restaurant is driven by availability. Given the relatively small supply of available franchises when compared to the number of qualified potential purchasers, purchasers usually do not have a meaningful option to choose between a new or existing restaurant.

Pursuant to the license agreement, any sale or assignment of a McDonald's franchise requires McDonald's prior written approval. When approving a transfer, McDonald's considers the same factors it considers when granting a franchise for a new restaurant. Only individuals who have undergone the requisite training in the McDonald's system and who meet McDonald's financial criteria may qualify for a transfer. With the exception of sales of its own McOpCo restaurants, McDonald's does not determine the sales price charged for an existing franchise. McDonald's, however, may inform the purchaser of potential investment or improvements that may be required in the restaurants. This notifies the purchaser of future capital requirements, and preserves the integrity of the system through ensuring that the transferee will have adequate capital available to maintain and upgrade the facilities.

## C. *Business Facilities Lease Arrangements*

McDonald's offers a business facilities lease (BFL) program to individuals who otherwise meet McDonald's criteria, but do not have sufficient capital to purchase a McDonald's restaurant. Under the BFL arrangement, McDonald's leases the restaurant, and all assets associated with its operation, to a

prospective franchisee. In addition to the rent and service fees that McDonald's charges all franchisees, McDonald's imposes an additional rental fee on BFL franchisees, typically 4.5 percent of sales, to cover the costs which are typically borne by the franchisee. The lessee under the BFL has an option to purchase the restaurant during the 3-year BFL term. If the option is exercised, the franchisee pays the option price plus the initial franchise fee. The lessee then typically receives a license and lease with a 20-year term.

## V. *Rewrites*

A McDonald's franchise is generally granted for a period of 20 years, beginning with a restaurant's opening. In the 17th year of the franchise term, the McDonald's Rewrite Committee examines the restaurant's operations and determines whether to offer the franchisee a new 20-year franchise (rewrite). The single most important factor that the committee considers is the long-term QSC record of the franchisee. McDonald's Rewrite Committee may recommend a short-term rewrite (less than 20 years) in certain situations, including those in which the franchisee has performed inconsistently.

If a rewrite is approved, the terms are outlined in a commitment letter. The Rewrite Committee may make the rewrite contingent on satisfaction of conditions prior to the expiration of the original franchise term. The conditions, if any, frequently relate to the improvement of the restaurant facility to meet current McDonald's standards. If a rewrite is approved, McDonald's and the franchisee enter into a new agreement (i.e., a new franchise letter agreement, license, and lease).

In some cases, the Rewrite Committee may initially conclude that the franchisee is not qualified for rewrite. However, if the franchisee makes certain improvements and changes specified by the committee, then he may qualify for reconsideration by the committee during the 20th year of the franchise. In other cases, the committee may conclude that improvement is impossible and not even give the franchisee the opportunity to cure the deficiencies. In these cases, McDonald's gives the franchisee the opportunity to sell the restaurant business to a qualified buyer prior to the expira-

tion of the franchise term. McDonald's encourages these franchisees to take advantage of this opportunity and even provides limited assistance in finding a qualified purchaser. McDonald's approves these sales only if the buyer agrees to bring the restaurant up to current standards prior to the expiration of the original franchise.

McDonald's usually does not guarantee that a rewrite will be granted prior to the 17th year of the franchise term. Through December 31, 1990, McDonald's had considered a total of 2,055 rewrites. Of these, 91 percent were approved and 6 percent were denied. The remaining 3 percent remained under consideration at that time.

Obtaining a rewrite is critical to the continued success of the restaurant. For example, Robert Ahern operated a McDonald's restaurant in LaGrange, Illinois. Mr. Ahern was in the unique position of being the owner of the restaurant premises. McDonald's did not believe Mr. Ahern was maintaining McDonald's standards and suggested that he seek a qualified buyer. Mr. Ahern refused to sell, so McDonald's terminated his franchise and removed the Golden Arches and all signage or other indicia of McDonald's. Mr. Ahern reopened the restaurant as a hamburger restaurant called "Berney's". McDonald's subsequently opened a new restaurant within two blocks of Berney's. Berney's went out of business in less than 1 year.

Another example involved Eli Schupack. Mr. Schupack operated a McDonald's restaurant in Omaha, Nebraska, from 1965 to 1981. Mr. Schupack was also in the unique position of owning the restaurant premises. McDonald's refused to grant a rewrite to Mr. Schupack, and after the franchise expired, the Golden Arches and all signage, trademarks, and trade names identifying the restaurant as a McDonald's were removed. Mr. Schupack reopened the restaurant as "Dodge City Hamburgers" and offered the same type of food products as the former McDonald's restaurant. Mr. Schupack retained his crew employees and managers. Despite their efforts, sales immediately fell substantially, and the Dodge City Hamburgers restaurant ultimately failed. Subsequent to the closing of Dodge City Hamburgers, McDonald's opened a new restaurant in November 1982 within a few blocks of the former Dodge City Hamburgers restaurant location. Sales at that new McDonald's restaurant during its first full 12

months of operation (December 1982 to November 1983) were $1,212,556, as compared with sales at Mr. Schupack's McDonald's restaurant during the last 12 full months of its operation (August 1980 to July 1981) of $1,304,541.

### OPINION

Our principal task is to decide what portion of the purchase price paid by petitioners for operating McDonald's restaurants is properly allocable to the McDonald's franchise for purposes of amortization under section 1253(d)(2)(A). The parties agree on the value of the tangible assets that were purchased. The parties also agree that a relatively small amount of the purchase price of each restaurant is attributable to going-concern value. The parties disagree on how to allocate the remaining portion of the purchase price. Petitioners argue that the remainder should be allocated to the McDonald's franchise.

Respondent's position is that the price McDonald's charged for new franchises ($12,500) is a "perfect" market comparable that establishes the value of all McDonald's franchises. We disagree. The evidence indicates that McDonald's had legitimate and longstanding business reasons for charging less than market value for new McDonald's franchises. These reasons can be traced to the business philosophy of McDonald's founder, who believed that McDonald's should emphasize the long-term relationship with franchisees rather than try to maximize up-front profits. McDonald's sought franchisees who would depend on their McDonald's restaurant for their livelihood (i.e., owner/operators, not investors). McDonald's also wanted to avoid saddling new franchisees with huge debts, which would prevent them from prospering, and to ensure that the number of applicants remained high. As a result, McDonald's decided to maintain a $12,500 fee for new franchises, despite the fact that it could have charged substantially more.[16]

Respondent also argues that, as a matter of law, a subsequent franchisee may not amortize an amount in excess of the amount that the original franchisee paid for the fran-

---

[16] Respondent seems to argue that a reasonable business person would not follow a philosophy that did not extract maximum value for a franchise. In our opinion, McDonald's had cogent business reasons for charging less than market value for new franchises and it appears that McDonald's approach has worked rather well.

chise. We find no authority for this position in the statute or case law, and respondent cites none. Respondent has issued a revenue ruling that specifically permits a subsequent franchisee to amortize the full price paid for the franchise. Rev. Rul. 88-24, 1988-1 C.B. 306.[17] Although the facts in the ruling do not indicate what the original franchisee paid for the franchise, the ruling specifically limits the amounts that the subsequent franchisee may amortize to the portion of the purchase price properly allocated to the purchase of the franchise. The ruling states: "The Internal Revenue Service will scrutinize closely transactions of this type to ensure a proper allocation of the purchase price". Rev. Rul. 88-24, 1988-1 C.B. at 307. The fact that the ruling specifically contemplates, and indeed limits, the amount which a subsequent franchisee can amortize, and yet says nothing about limiting that amount to the amount paid by the initial franchisee, gives rise to the inference that the subsequent franchisee may amortize the full purchase price of a franchise, even if it exceeds the amount paid by the original franchisee. We have held that taxpayers are entitled to amortization in the situation described in Rev. Rul. 88-24, *supra*, *Jefferson-Pilot Corp. v. Commissioner*, 98 T.C. 435, 453-454, 456-457 (1992); *Tele-Communications, Inc. v. Commissioner*, 95 T.C. 495, 505 (1990). In both cases, we allowed subsequent franchisees to amortize franchise costs in excess of the amount paid by the original franchisee.

Section 1.1253-1(d), Proposed Income Tax Regs., 36 Fed. Reg. 13151 (July 15, 1971) (hereinafter section 1.1253-1(d), Proposed Income Tax Regs.), addresses the application of section 1253 to the sale of an ongoing business and states: "Section 1253 * * * [applies] to amounts which are attributable to the transfer of a franchise * * * incident to the transfer of a trade or business."[18] The proposed regulation states that the amount deductible by the purchaser under section 1253 is based on the amount of the purchase price reasonably allocated to the purchase of the franchise. Nowhere in the pro-

---

[17] Revenue rulings are an official interpretation by the Commissioner of the revenue laws and may be relied on by taxpayers whose facts and circumstances are substantially the same. Rev. Proc. 86-15, 1986-1 C.B. 544. Congress has cited Rev. Rul. 88-24, 1988-1 C.B. 306, with approval. See H. Conf. Rept. 101-386, at 617 n.1 (1989); H. Rept. 101-247, at 1348 (1989).

[18] Proposed regulations have not been formally adopted and are not binding on this Court. Proposed regulations are tantamount to a position advanced by respondent on brief. *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265-1266 (1970).

posed regulation is it suggested that the amount reasonably allocated to the purchase of the franchise is limited to the amount paid by the original franchisee, and an example in the proposed regulations suggests otherwise.[19]

Respondent argues that in addition to the franchise, petitioners acquired other nonamortizable intangible assets, such as goodwill, and that a large portion of the purchase price of each restaurant should be allocated to those intangibles. Except for a relatively small allocation to going-concern value, respondent makes no attempt to assign a value to any specific nonamortizable intangible asset.

One of the principal intangible assets likely to be found when ownership of an operating business is transferred is goodwill. Goodwill represents the expectancy that "old customers will resort to the old place" of business. *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1247 (5th Cir. 1973); see also *VGS Corp. v. Commissioner,* 68 T.C. 563, 590 (1977). The essence of goodwill is a preexisting business relationship founded upon a continuous course of dealing that can be expected to continue indefinitely. *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 233 (1975). Goodwill is characterized as "the expectancy of continued patronage, for whatever reason." *Boe v. Commissioner,* 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); see *Philip Morris, Inc. v. Commissioner,* 96 T.C. 606, 634 (1991), affd. 970 F.2d 897 (2d Cir. 1992).

A McDonald's franchise encompasses attributes that have traditionally been viewed as nonamortizable goodwill. However, to the extent that these attributes are embodied in the McDonald's franchise, trademarks, and trade name, their cost is amortizable under the explicit provisions of section

---

[19] On at least five occasions, respondent has indicated that the subsequent franchisee may amortize the full purchase price paid to the original franchisee even when that price exceeded the amount paid for the franchise by the original franchisee. See Priv. Ltr. Rul. 87-43-014 (July 24, 1987); Priv. Ltr. Rul. 87-39-054 (July 1, 1987); Priv. Ltr. Rul. 87-36-047 (June 10, 1987); Tech. Adv. Mem. 87-28-010 (Apr. 3, 1987); Tech. Adv. Mem. 86-30-002 (Jan. 27, 1986). In these rulings and memoranda, the original franchisee did not make an initial payment for the rights granted under the franchise. Nevertheless, respondent indicated that the subsequent franchisee could amortize the full amount paid for the franchise rights. Although private letter rulings are not precedent, sec. 6110(j)(3), they "do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws." *Hanover Bank v. Commissioner,* 369 U.S. 672, 686 (1962); see *Rowan Cos. v. United States,* 452 U.S. 247, 259 (1981); *Estate of Cristofani v. Commissioner,* 97 T.C. 74, 84 n.5 (1991); *Estate of Jalkut v. Commissioner,* 96 T.C. 675 (1991); *Woods Investment Co. v. Commissioner,* 85 T.C. 274, 281 n.15 (1985); see also *Hall v. Commissioner,* T.C. Memo. 1991-133.

1253(d)(2)(A). On the other hand, if petitioners acquired intangible assets, such as goodwill, which were not encompassed by or otherwise attributable to the franchise, then a portion of the purchase price should be allocated to such assets.

A McDonald's franchise includes the rights to occupy and operate a McDonald's restaurant at a specific location owned or controlled by McDonald's, to utilize all attributes of the McDonald's system, including the trade name, trademarks, and other identifying features which belong to McDonald's, and to receive ongoing advice and support from McDonald's with regard to the McDonald's restaurant business.

The purchaser of an existing McDonald's franchise can expect McDonald's customers to return to the restaurant. This expectancy is created by and flows from the implementation of the McDonald's system and association with the McDonald's name and trademark.[20] Within a week of opening, a new McDonald's restaurant typically reaches the level of sales that it will average over the first year. The number of sales transactions tends to stay constant from the first year through the life of the franchise. This suggests that a customer's decision to patronize the restaurant is attributable to the goodwill inherent in the McDonald's system. The experiences of former franchisees Messrs. Ahern and Schupack support this conclusion. Both disassociated themselves from McDonald's but continued to operate their restaurants under another name.[21] Both restaurants failed within 18 months of the removal of all items which identified their restaurants with the McDonald's system.

Customers patronize McDonald's restaurants because they know what they are going to get in terms of product, quality, service, and price from store to store.[22] This is the direct result of the McDonald's system that requires specific standards of quality, service, and cleanliness as part of the franchise agreement. Certainly, the quality, consistency, and

---

[20] Goodwill is typically represented by trade names and trademarks. *Philip Morris, Inc. v. Commissioner,* 96 T.C. 606, 634 (1991), affd. 970 F.2d 897 (2d Cir. 1992).

[21] The situations of Messrs. Ahern and Schupack were unique in that they both owned the premises on which their restaurants were located.

[22] This is not to imply that location is an unimportant factor. However, McDonald's owned or leased the land and buildings housing petitioners' restaurants and leased this property to petitioners on terms that equaled or exceeded the fair rental value. Thus, respondent makes no argument that a portion of the purchase price should be allocated to the value of the leasehold. See *supra* note 8.

service that the system produces result in goodwill, but because of the structure of McDonald's, that goodwill inheres in the McDonald's trade name and trademarks.

The McDonald's trade name and trademarks are available to individual restaurant operators only through a McDonald's franchise. The massive advertising effort and the insistence that only the McDonald's name be associated with the restaurant's operation ensures that the restaurant is identified as part of a larger organization that the customer knows and trusts. The right to use the McDonald's system, trade name, and trademarks is the essence of the McDonald's franchise. The rights and benefits conferred by a McDonald's franchise are not assets that the franchisee may use or sell apart from the franchise. Respondent did not identify, and we cannot discern, any quantifiable goodwill that is not attributable to the franchise. We find that petitioners acquired no goodwill that was separate and apart from the goodwill inherent in the McDonald's franchise.[23]

Our finding that the franchise acts as the repository for goodwill is consistent with previous decisions of this and other courts. See *Montgomery Coca-Cola Bottling Co. v. United States,* 222 Ct. Cl. 356, 379-380, 615 F.2d 1318, 1331 (1980); *Zorniger v. Commissioner,* 62 T.C. 435, 444, 445 (1974); *Mittelman v. Commissioner,* 7 T.C. 1162 (1946); *Akers v. Commissioner,* 6 T.C. 693, 700 (1946). For instance, in *Montgomery Coca-Cola Bottling Co. v. United States,* 222 Ct. Cl. at 381-382, 615 F.2d at 1331-1332, the Court of Claims, in valuing a Coca-Cola bottling franchise, stated:

Anything resembling goodwill attaches solely to the national company and the name of the product * * *. Customers buy Coca-Cola because of * * * the product, not because of who bottles it. Since goodwill is considered to be the value of the habit of customers to return to purchase a product at the same location, the absence of the product would destroy the value of the habit; and since only one entity has the perpetual right to distribute Coca-Cola in a territory, the value of goodwill, and the franchise are so interrelated as to be indistinguishable, all the value should then be assigned to the franchise. * * * [Fn. ref. omitted.]

---

[23] Even if we were inclined to accept respondent's position that there was some goodwill apart from the franchise, respondent has not proposed a value to be attributed to such goodwill and presented no expert testimony on this topic. Respondent did not present any experts to support her position that the franchises should be valued at $12,500, nor did respondent present experts to show that the valuation methods employed by petitioners' experts were improper.

Similarly, in *Mittelman v. Commissioner, supra,* we addressed the issue of whether part of the value of a corporation which sold popular brands of shoes from space which it leased from a well-known department store was attributable to the corporation's goodwill. Under the terms of the lease, the corporation sold the shoes under the department store's name, and the facts indicate that the arrangement was set up so that customers would believe that they were purchasing shoes from the department store. We stated that:

It seems to us that whatever intangible value attached to petitioner's business sprang from the sale of well known and respected brands of shoes, and from the sale of those shoes in a location known to the public as a part of the Lindner Co.'s store. We can find no basis, in these peculiar circumstances, for the allocation of any value for good will * * * [to the taxpayer's corporation]. * * * [7 T.C. at 1170.]

The conclusions reached by petitioners' experts are consistent with, and support, our finding. Patrick J. Kaufman[24] testified about the historical development of franchises and the economic function that they serve. According to Mr. Kaufman, the modern private commercial franchisor accumulates and institutionalizes its business know-how and distributes this knowledge to its franchisees through the franchise agreement. The franchisor also acts as a clearing house for ideas and information generated by the individual franchisees. Consequently, great economies of scale are achieved under a franchise format. The franchisor maintains control over the operation of the individual franchisees by insisting on strict compliance with standards that are designed to ensure that the good name associated with the franchisor and its trademarks is maintained and enhanced. Mr. Kaufman explained that the ability to associate with the franchisor's name and trademarks was key to the franchise arrangement because only through this association can the franchisee take advantage of the franchisor's good will. The franchisor increases its opportunity to generate more goodwill through the successful implementation of its business format.

Mr. Kaufman also considered McDonald's franchises specifically. He concluded that the McDonald's name and

---

[24] Patrick J. Kaufman, Ph.D, is an associate professor of marketing at Georgia State University.

trademarks act as the repository for all goodwill developed throughout the company's history. Requiring franchisees to adhere to McDonald's standards of quality, cleanliness, and service ensures that the value and integrity of the McDonald's system is maintained and that customer perception of McDonald's is reinforced with every visit, regardless of the restaurant visited. Because operating procedures are explicitly delineated by the system, any goodwill generated by store operations flows from implementation of the McDonald's system. Mr. Kaufman concluded that in the McDonald's system of restaurants, there is no such thing as franchisee goodwill.

Daniel A. MacMullan[25] valued the intangible assets purchased by petitioners. He also concluded that there was no goodwill separate and apart from that which was derived from the franchise agreement. Mr. MacMullan used both the discounted cash-flow and the incremental cash-flow methods to value the franchises involved in these cases. Mr. MacMullan concluded that the McDonald's franchises that petitioners purchased were very valuable and that petitioners properly allocated a significant portion of the purchase price to the franchises. Mr. MacMullan also found that a small amount of the purchase price was allocable to going-concern value, which was separate from the franchise.

Respondent seems to argue that if most of the value of a McDonald's franchise is based on the expectancy of continued patronage, then the value connected with that expectancy cannot be amortized because it is not separate and distinct from goodwill. Respondent points out that a taxpayer may not depreciate an intangible asset under section 167 absent a showing that the asset is separate and distinct from goodwill and seems to argue that amortization under section 1253 is similarly restricted. Respondent cites *Newark Morning Ledger Co. v. United States,* 945 F.2d 555 (3d Cir. 1991), cert. granted 503 U.S., 112 S. Ct. 1583 (1992), as support.

*Newark Morning Ledger* involves section 167. The rules surrounding the depreciation and amortization of intangibles under section 167 do not override the specific provisions of section 1253(d)(2). The assets to which section 1253 applies,

---

[25] Daniel A. MacMullan is senior vice president of the Manufacturers' Appraisal Co. and specializes in the valuation of business interests.

by their very nature, are not normally separate and distinct from goodwill. The value of a franchise in the private commercial context depends, in large part, on the goodwill inherent in the franchisor's business system. Typically, as in the case of a McDonald's franchise, the franchisee is entitled to use the franchisor's trade name and trademarks as part of the franchise agreement. Trademarks and trade names are the embodiment of goodwill. *Philip Morris, Inc. v. Commissioner,* 96 T.C. at 606, 634. In enacting section 1253(d)(2), Congress specifically provided for the amortization of the cost of "a franchise, trademark, or trade name" and thus provided for the amortization of assets whose value is inextricably related to goodwill. If the value of goodwill inherent in a franchise, trademark, or trade name could not be amortized, section 1253(d)(2)(A) would be largely inapplicable to most, if not all, private commercial franchises. This clearly was not Congress' intent. See *Jefferson-Pilot Corp. v. Commissioner,* 98 T.C. 435, 440-441 (1992).[26]

The McDonald's system also encompasses much of what is typically identified as going-concern value. Going-concern value is defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *Philip Morris, Inc. v. Commissioner, supra* at 637; *VGS Corp. v. Commissioner,* 68 T.C. at 591; *Conestoga Transportation Co. v. Commissioner,* 17 T.C. 506, 514 (1951). Going-concern value relates less to the business reputation and the strength of customer loyalty than to the operating relationship of assets and personnel inherent in an ongoing business. *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1323 (1989). Going-concern value is characterized by the ability of an acquired business to continue to operate and generate income without interruption during and after acquisi-

---

[26] Sec. 1.1253-1(d)(2), *Example* (1), Proposed Income Tax Regs., 36 Fed. Reg. 13151 (July 15, 1971), contains an illustration of the sale of an operating restaurant along with the right to continue to use the seller's trade name. Of the purchase price, $100,000 is attributed to intangibles ($40,000 to an anticipated increase in sales resulting from a proposed new highway and $60,000 to the right to use the seller's trade name). The example in the proposed regulation makes no separate allocation to the "goodwill" that is inherent in the trade name. The example would allow the entire $60,000 allocable to the trade name to be amortized under sec. 1253(d)(2)(A). This illustration demonstrates that the value of goodwill inherent in a trade name, trademark, or franchise is subsumed in the franchise, trademark, or trade name for purposes of amortization under sec. 1253. We mention this example recognizing that proposed regulations are not authoritative, see *supra* note 18; however, they do reflect the Commissioner's views, see *supra* note 19.

tion. *Solitron Devices, Inc. v. Commissioner,* 80 T.C. 1, 19-20 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984); *VGS Corp. v. Commissioner, supra* at 592.

McDonald's vast experience in opening and operating restaurants means that many of the issues that a new business faces, and which are typically resolved only through trial and error, are already resolved through application of the McDonald's system. For instance, a new franchisee does not have to identify reliable suppliers because McDonald's provides the franchisee with a list of suppliers. Similarly, a new franchisee does not have to experiment with various procedures to determine the most efficient means for preparing its products and serving its customers because the McDonald's system already provides specific detailed instructions which describe the best operational methods and which reflect McDonald's years of experience in operating literally thousands of restaurants.

One aspect of going-concern value which petitioners concede is not included in a McDonald's franchise is the cost of assembling and training a new work force which is avoided by purchasing a restaurant that is already operating. Petitioners, however, argue that this cost is minimized under the McDonald's system. We agree. In many cases, a new franchisee is able to train new employees in another McDonald's restaurant, thereby avoiding the need to make inefficient "dry runs". McDonald's has institutionalized crew training, and its vast training resources enable a franchisee to assemble a crew on very short notice. Moreover, McDonald's restaurants experience a high turnover rate, so the enhanced value flowing from a trained work force is not as significant as it is in other businesses. Thus, although some going-concern value attributed to having a trained work force in place is not encompassed by the McDonald's franchise, this aspect of going-concern value is not as significant as it would be in many other businesses.

Attached as an appendix is a table that reflects what petitioners claim is the maximum going-concern value of the restaurants involved in these cases. Petitioners rely on the expert opinion of Daniel A. MacMullan and the report prepared by the Manufacturers' Appraisal Co. to support these values. On brief, respondent accepts in principle the going-

concern values reflected in Mr. MacMullan's report,[27] and "essentially agrees with the petitioners that operating McDonald's restaurants have comparatively little 'going concern value', when that term is understood to mean 'avoided start-up costs'." This seems to be Mr. MacMullan's understanding of the term. We, therefore, accept Mr. MacMullan's determinations concerning the amount of going-concern value that is separate from the franchise.

Respondent argues that petitioners also purchased the expectancy that McDonald's would renew the franchise at the end of its term and that this expectancy is a separate intangible asset to which a portion of the purchase price could be allocated. Prior cases have considered the renewal feature of a franchise as an aspect of the franchise when determining whether the franchise has a reasonably ascertainable useful life. *Finoli v. Commissioner,* 86 T.C. 697, 738 (1986); *Chronicle Publishing Co. v. Commissioner,* 67 T.C. 964, 979-980 (1977); *Rodeway Inns of America v. Commissioner,* 63 T.C. 414, 422 (1974); *Toledo TV Cable Co. v. Commissioner,* 55 T.C. 1107 (1971), affd. 483 F.2d 1398 (9th Cir. 1973); see also Rev. Rul. 66-140, 1966-1 C.B. 45, for a statement of the Commissioner's views. These cases indicate that franchise renewal expectations are generally not considered separate intangible assets. We think that the expectancy of renewal of a McDonald's franchise is an attribute of the franchise itself rather than a separate asset. To the extent an expectancy of renewal exists, it is attributable to McDonald's general practice in dealing with franchisees.

Respondent relies on *Nachman v. Commissioner,* 191 F.2d 934 (5th Cir. 1951), affg. 12 T.C. 1204 (1949), for the proposition that the prospect of renewal creates a separate intangible asset to which a portion of the purchase price is allocable. In *Nachman,* the taxpayer deducted, as an ordinary and necessary business expense, the full $8,000 that was paid to an existing licensee for a liquor license. Although the annual license fee was only $750, the local government limited the

[27] In response to petitioners' requested findings of fact on this point, respondent's only objection is to petitioners' characterization of the amount determined by Mr. MacMullan as the "maximum" amount of going-concern value. The basis for this objection is Mr. MacMullan's testimony that his valuation included all the material elements of going-concern value but that it was "possible" that other elements may exist. Respondent has not identified what these other elements could be, and we are not aware of any. Thus, we conclude that this objection aside, respondent basically agrees with the value reached by Mr. MacMullan.

number of available liquor licenses and preferred to issue licenses to holders of existing licenses. The taxpayer was allowed to deduct the amount paid in consideration for the annual license fee, but the balance of the purchase price was held to have been paid for a capital asset that could not be amortized because it did not have an ascertainable useful life. The court did not hold that the renewal feature was a capital asset that was separate and distinct from the license. Rather, the renewal feature was an aspect of the license which enhanced its value as a capital asset. See *Hall v. Commissioner*, 406 F.2d 706, 710 (5th Cir. 1969) (stating that the liquor license in *Nachman* was renewable and therefore had an indeterminate useful life), affg. 50 T.C. 186 (1968); *Commissioner v. Indiana Broadcasting Corp.*, 350 F.2d 580, 586 (7th Cir. 1965) (stating that the liquor license in *Nachman* was "indefinite in duration and, therefore, a nondepreciable capital asset"), revg. 41 T.C. 793 (1964); *Curry v. United States*, 298 F.2d 273, 275-276 (4th Cir. 1962) (stating that the liquor license in *Nachman* was "enhanced in value by an almost limitless right of renewal and transferability"); *Hall v. Commissioner*, 50 T.C. at 199 (stating that the liquor license in *Nachman* was renewable and had an indeterminate useful life). *Nachman* is consistent with precedent holding that the renewal feature of a license is not a separate asset; instead, it is an aspect of the license which is examined to determine whether the license itself has an ascertainable useful life.

Respondent also argues that "It is also undisputed that current owner-operators have an 'inside track' in acquiring both new and operating McDonald's restaurants" and that by selling a McDonald's franchise, the seller is conferring on the buyer the rights to this "inside track". Respondent concludes that the right to this "inside track" constitutes a separate nonamortizable asset to which part of the purchase price should be allocated. We have three responses to this argument.

First, it is not entirely clear that existing franchisees have an "inside track" on acquiring existing franchises. Respondent claims existing franchisees had this inside track because they acquired 61.5 percent of all "new" locations and 63.3 percent of all transferred locations, compared to 12.9 percent and 29.4 percent, respectively, for new franchisees. However,

because the record contains insufficient information to compare the percentage of applicants who already own a franchise to the percentage who do not, we are unable to ascertain whether this "inside track" exists. An existing franchisee who properly implements the McDonald's system may receive an "expandable" designation, but this designation is personal to the franchisee. The "expandable" designation is not transferred pursuant to the sale of the restaurant, and allocation of a portion of the purchase price to this designation is not appropriate. See *Solitron Devices, Inc. v. Commissioner,* 80 T.C. at 17 (indicating that it is improper to allocate a portion of the purchase price to assets not transferred pursuant to the sale).

Second, even if this alleged "inside track" did exist, it would only be of value to buyers who did not already own a McDonald's restaurant. A buyer who already owned a McDonald's restaurant would, presumably, already be privy to this "inside track" and would not pay for it when purchasing an additional McDonald's restaurant. At least five petitioners owned more than one McDonald's restaurant. It would be inappropriate to allocate a portion of the purchase price paid by these petitioners for their second or third restaurant to the purchase of an "inside track". If an "inside track" existed, they already had it. The record indicates that the price paid for a McDonald's restaurant is typically a function of the restaurant's previous 12-month sales volume.[28] Whether the buyer already owns a McDonald's restaurant does not appear to affect the price.

Third, whatever "inside track" may exist as a result of being a franchisee results from and is an attribute of the franchise. As previously stated, we perceive no justification for creating a separate asset for every benefit derived from being a franchisee.

---

[28] The parties stipulate that a franchisee who entered into a BFL arrangement with McDonald's may exercise the option to purchase the restaurant at the greater of the "minimum option price" or a specified percentage of the restaurant's previous 12-month sales volume (referred to as trailing 12-month sales). Petitioners presented the testimony of Mr. Winston Christiansen, a senior vice president at McDonald's who is very familiar with all aspects of the McDonald's franchise system. Mr. Christiansen testified that the specified percentage of the trailing 12-month sales upon which the purchase price is based ranged from 42 to 52 percent in 1991. He indicated that this price was slightly below market price. Mr. Christiansen also testified that the price paid by McOpCo for an existing franchise was based on trailing 12-month sales. The record indicates that third-party purchasers of McDonald's restaurants also base their purchase price on trailing 12-month sales.

Respondent argues that part of the purchase price reflects the price paid to the seller for his uncompensated investment of time in the McDonald's training program. We can see no motivation for a buyer to pay for this, nor can we conceive of how the seller's uncompensated training time could be considered an asset used in the buyer's operation of a restaurant. The seller cannot transfer his personal training to the buyer and, indeed, McDonald's requires buyers to complete the same training program before McDonald's will consent to the transfer of the franchise. Respondent's position would require us to accept the unusual concept that cost basis can be allocated to property other than the property purchased. We refuse to do this. *Solitron Devices, Inc. v. Commissioner*, 80 T.C. at 17.

Finally, respondent contends that the "high demand" for McDonald's restaurants and the buyer's interest in accelerating the opportunity to enjoy the extraordinary return on investment, characteristic of McDonald's restaurants, represent intangible assets to which a portion of the purchase price is properly allocable. We disagree. High demand is simply a factor that affects the price paid for the franchise. Likewise, a purchaser's willingness to pay for the immediate right to enter a lucrative business operation does not create a separate asset. See *Solitron Devices, Inc. v. Commissioner, supra.*

We conclude that the purchase price of the franchises should be determined by subtracting the value of the tangible assets and going-concern value from the purchase price. This formula is based on our conclusion that, except for going-concern value, all other intangible asset value is attributable to the franchise. We hold that petitioners are entitled to amortize the amount of the purchase price allocated to the franchises pursuant to section 1253(d)(2)(A). These amounts are reflected in the appendix.

*Decisions will be entered under Rule 155 in docket Nos. 38037-87, 31478-88, 31479-88, 13576-89, and 15038-89.*

*An appropriate order will be issued in docket Nos. 31477-88, 10551-89, 14540-89, 14849-89, 15037-89, and 16033-89.*