STOKELY USA, INC., FORMERLY OCONOMOWOC CANNING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4385-91.　　　　　　　Filed May 24, 1993.

Robert A. Schnur and Joseph A. Pickart, for petitioner.
James M. Klein and Nelson E. Shafer, for respondent.

OPINION

RUWE, Judge: Respondent determined deficiencies in petitioner's corporate income tax as follows:

| TYE | Deficiency |
|---|---|
| Mar. 31, 1983 | $62,931 |
| Mar. 31, 1984 | 75,201 |
| Mar. 31, 1985 | 74,037 |
| Mar. 31, 1986 | 11,106 |
| Total | 223,275 |

The only issue we must decide to resolve this case is whether a lump sum that petitioner paid to purchase certain trademarks may be amortized pursuant to section 1253(d)(2)(A).[1]

This case was submitted fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner was incorporated in 1920 under the name Oconomowoc Canning Co. When it filed the petition in this case, petitioner was a Wisconsin corporation with its principal office in Oconomowoc, Wisconsin. Petitioner is in the business of processing, canning, and marketing canned and frozen vegetables, fruits, tomato products, and juices. Its principal products are canned corn, beans, peas, and beets. Petitioner's net sales during 1983 through 1989 were as follows:

| Fiscal year | Net Sales |
|---|---|
| 1983 | $43,900,000 |
| 1984 | 105,200,000 |
| 1985 | 131,400,000 |
| 1986 | 139,700,000 |
| 1987 | 159,800,000 |
| 1988 | 188,800,000 |
| 1989 | 214,600,000 |

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

During the years in issue, roughly half of petitioner's net sales (and 26 percent of total sales) were made under the trademarks and trade names Stokely's or Stokely's Finest. Products sold by petitioner under the Stokely trademarks and trade names carry a higher price than those sold under its other labels and generate a higher unit profit margin for petitioner.

Petitioner initially obtained the right to use the Stokely's Finest trademarks and trade names in a 1983 license agreement with Stokely-Van Camp, Inc. (SVC),[2] an unrelated Indiana corporation that also owned the rights to other trademarks and trade names, including Stokely's, Stokely-Van Camp's Finest, and Van Camp's. In 1983, petitioner also purchased production facilities related to the Stokely's Finest trademarks that it licensed from SVC. All SVC's trademarks, trade names, and registrations included rights of use for a variety of canned and frozen food products, including pork and beans. Petitioner was also interested in obtaining SVC's pork and beans product lines and related trademarks; however, SVC specifically retained its Stokely-Van Camp's and Van Camp's trademarks and trade names and prohibited petitioner from using the Stokely's Finest trademarks on pork and beans products. At no time prior to its negotiations with SVC did petitioner produce pork and beans products. As of June 1983, SVC's share of the market for canned pork and beans in the United States was about 33 percent, totaling about $150 million annually in sales.

In September 1983, the Quaker Oats Co. (Quaker Oats) acquired all the assets of SVC. Petitioner's management expressed to Quaker Oats its interest in acquiring additional rights in the Stokely's finest trademarks[3] and rights to the Stokely's[4] and Stokely-Van Camp's finest[5] trademarks.

Quaker Oats' management informed petitioner of the company's interest in such a transaction, but stated that it would not transfer any trademark containing the name Van Camp's; nor would it transfer its pork and beans product lines. Quaker Oats' management further informed petitioner

---

[2] There were two trademarks using the name Stokely's Finest with registration numbers 999,795 and 277,037, respectively. Petitioner did not obtain the rights to use the trademark Stokely's, registration number 994,422, in this license agreement.

[3] U.S. Reg. Nos. 999,795 and 277,037.

[4] U.S. Reg. No. 994,422.

[5] U.S. Reg. No. 999,794.

that Quaker Oats desired to protect the Van Camp's trademark as used for pork and beans and that any agreement regarding the Stokely trademarks must include a restriction on the use of those trademarks for pork and beans products because of the close connection in the public mind between the Van Camp's and Stokely's names. Quaker Oats' management believed that the Van Camp's trademark would be seriously diluted, and Quaker Oats' pork and beans sales would be materially and adversely affected, if petitioner were allowed to use the Stokely trademarks for pork and beans products. The current label used by Quaker Oats on pork and beans products includes the Van Camp's name and, in small type, the name "Stokely". On November 16, 1983, petitioner made an offer of $1,250,000 for the right to acquire ownership of the Stokely's Finest trademarks, a trademark called "Shellie", and the Stokely-Van Camp's Finest trademark. Quaker Oats refused to consider transferring rights in any trademarks that included the name Van Camp's.

Petitioner and Quaker Oats eventually agreed to the transfer of certain trademarks owned by Quaker Oats. On November 5, 1984, Quaker Oats transferred to the Quaker Oats Foundation (the foundation), a private foundation controlled by Quaker Oats, the trademarks that it intended to transfer to petitioner. On November 15, 1984, the foundation and petitioner entered into a trademark transfer agreement pursuant to which, for a lump-sum payment of $1,584,500, the foundation:

[transferred], [sold] and [assigned] to * * * [petitioner] * * * THE FOUNDATION'S right, title and interest, both statutory and at common law, in The Trademarks and the registrations thereof, subject to * * * [certain restrictions] * * * including the right to sue for and collect damages for any past infringement * * *.

The trademarks referred to in the agreement were Stokely's, Shellie, Bavarian Style, and the two Stokely's finest trademarks (the Stokely trademarks). Also under the agreement, petitioner's royalty obligations to SVC for the latter two trademarks were canceled.[6] The restrictions mentioned in the agreement were as follows: (1) Because of prior agreements with SVC, petitioner's rights were subject to the rights of two

---

[6] The Stokely-Van Camp's and Van Camp's trademarks and trade names were not transferred and remained in use by Quaker Oats.

other companies in various Stokely trademarks; (2) United Foods, Inc., held the exclusive right to use the Stokely's and Stokely's Finest trademarks on frozen foods sold in the United States during 1983, 1984, and 1985; (3) Stokely-Van Camp of Canada, Inc., held the exclusive right and license to use in Canada, and the nonexclusive right and license to use in certain specified European countries, the trademarks Stokely's, Stokely's Finest, Stokely-Van Camp's, and Van Camp's; and (4) the agreement also contained the following restrictions:

2.1 [Petitioner] shall not use The Trademarks on * * * [pork and beans, and products containing beans and wieners (such wieners being composed of either beef, pork, chicken or poultry or a combination thereof) for] * * * [20 years]. * * *

2.2 [Petitioner], and its successors and assigns shall never use the trademark "VAN CAMP" on any products either as part of or apart from The Trademarks.

\* \* \* \* \* \* \*

2.4 The FOUNDATION shall have the right to disapprove any assignment of [petitioner's] right, title and interest in the Trademarks for a period of five years.

The payment amount was negotiated by the parties on the basis of the present value of the estimated future royalty payments that petitioner would have had to make to Quaker Oats under the SVC license agreement. Petitioner delivered to the Foundation its certified check for $1,584,500 on November 15, 1984. The agreement remained in effect for all years relevant to this proceeding.[7]

In January 1985, petitioner changed its name to Stokely USA, Inc. On December 24, 1986, petitioner acquired from the American National Co. a number of processing plants, including one used for pork and beans, as well as an inventory of pork and beans. Petitioner proceeded to sell this inventory under a variety of labels, not including the Stokely trademarks or trade names. Petitioner also continued production of pork and beans products at the acquired plants for several months under other trade names and trademarks and had acquired another plant that it could have converted to the

---

[7] Petitioner remains unable to use the Stokely trademarks in Canada and has only a nonexclusive right to use them in England, Scotland, Sweden, Denmark, Norway, Finland, France, Belgium, Germany, Switzerland, and Holland. Petitioner subsequently registered the Stokely trademarks in Mexico and has begun to make sales into that country.

production of consumer-size pork and beans products. However, petitioner was soon forced to discontinue production of pork and beans due to the lack of a major brand name and consequent low profitability for those products. Had petitioner been able to use the Stokely trademarks on pork and beans products, or obtain rights to the Van Camp's trademarks, petitioner would have continued pork and beans production and converted the other plant for such production.

Quaker Oats continued selling pork and beans under the Van Camp's label. During the years after the agreement between petitioner and the foundation, Van Camp's pork and beans products accounted for approximately 28 percent of the U.S. market for such products. The dollar amounts of the sales comprising this share in 1986 through 1989 were as follows:

| Fiscal year | Sales |
| --- | --- |
| 1986 | $123,000,000 |
| 1987 | 126,000,000 |
| 1988 | 134,000,000 |
| 1989 | 132,000,000 |

Petitioner took deductions beginning in the taxable year ended March 31, 1985, for amortization of the lump-sum payment paid to the foundation.[8] On December 27, 1990, respondent issued a notice of deficiency covering petitioner's taxable years ended March 31, 1983 through 1986, in which these deductions were disallowed. This determination also led respondent to disallow petitioner's amortization deduction for the taxable year ended March 31, 1987. While that year is not before the Court, the 1987 disallowance caused respondent to reduce a claimed net operating loss carryback from that year to the taxable year ended March 31, 1984. This led to an increased deficiency for 1984. Respondent's determination also led to the reduction of a claimed investment credit carryback from the taxable year ended March 31, 1986, to petitioner's taxable year ended March 31, 1983. Peti-

---

[8] On brief and in the notice of deficiency, respondent states that petitioner took a deduction of $160,950 in 1985 and in 1986. On its return, however, petitioner lists deductions for "Trademark Amortization" in the amounts of $148,504 and $158,450, respectively. Neither the petition nor petitioner's brief suggests an amount for the deductions at issue. We note, however, that sec. 1253(d)(2) mandates a 10-year ratable amortization schedule, with which a deduction of $158,450 would comport in the case of a single cash payment of $1,584,500, as was made here. This discrepancy is unexplained.

tioner timely filed a petition with this Court seeking a redetermination of the deficiencies determined for its taxable years ended March 31, 1983, through March 31, 1986.[9]

The only issue is whether petitioner is entitled to amortize the $1,584,500 payment it made for the purchase of the Stokely trademarks. Section 1253(d)(2)(A) provides for amortization of the cost of a trademark over a 10-year period if, pursuant to section 1253(a), the transfer of the trademark is not treated as a sale or exchange of a capital asset.[10] Section 1253(a) states:

A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.

There is no question that the Stokely trademarks were transferred to petitioner. Therefore, whether the transfer of the Stokely trademarks is to be treated as the sale or exchange of a capital asset under section 1253(a) depends upon (1) whether the foundation retained any "power, right, or continuing interest with respect to the subject matter" of the Stokely trademarks and, if so, (2) whether one or more of these rights was "significant".[11]

---

[9] Pursuant to the pleadings and briefs, the only issue we are asked to decide is the deductibility of the payment made to the foundation on Nov. 15, 1984, and its effect on the aforementioned carrybacks. Despite this, respondent makes reference on brief and in the notice of deficiency to a deduction of $2,500 for amortization taken in petitioner's taxable year ended Mar. 31, 1984. Given that the only transaction at issue occurred well after the end of that taxable year, it is unlikely that the $2,500 deduction stems from that transaction. Moreover, no such deduction appears on petitioner's 1984 corporate income tax return. While petitioner did deduct $6,448 for "Amortization" on its corporate income tax return for that year, on its corporate income tax returns for subsequent years, petitioner labeled the deductions for the transaction at issue as "*Trademark* Amortization". (Emphasis added.) Thus, we are confused as to the source of the $2,500 deduction disallowed by respondent. Petitioner, however, has failed to contest that determination.

[10] In some cases, the amortization period may be shorter. Sec. 1253(d)(2)(A) provides:

(A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter;

See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7622(b) and (c), 103 Stat. 2377-2378 (amending sec. 1253(d) to provide for capitalization and 25-year amortization of all payments over $100,000 in the case of transfers after Oct. 2, 1989).

[11] While both parties rely, to some degree, on case law decided prior to the enactment of sec. 1253, we look primarily to the provisions of the statute since sec. 1253 was enacted in large part to resolve the confusion engendered by prior case law. *Tomerlin Trust, Transferee v. Commissioner,* 87 T.C. 876, 883 (1986).

## 1. *Did the Transferor Retain Any Power, Right, or Continuing Interest in the Subject Matter of the Trademarks?*

Petitioner contends that the foundation's 5-year right to disapprove any assignment of petitioner's right, title, and interest in the trademarks and the 20-year prohibition on petitioner's use of the trademarks with respect to pork and beans (the pork and beans restriction), represent powers, rights, or continuing interests retained by the foundation.[12] We agree with petitioner that the foundation's right to disapprove transfer of the trademarks by petitioner during the first 5 years after the transfer constitutes a retained power, right, or continuing interest with respect to the subject matter of the trademarks. Respondent does not dispute this. Respondent's only argument with respect to this retained power, right, or interest is that it is not "significant" within the meaning of section 1253(a).

Respondent argues, however, that the pork and beans restriction does not constitute a retained power, right, or continuing interest, but rather, merely defines the assets that petitioner purchased. In essence, respondent contends that petitioner simply did not purchase the right to use the Stokely trademarks for pork and beans. According to respondent, petitioner purchased the right to use the Stokely trademarks on everything except pork and beans, and the foundation retained no right to use the Stokely trademarks. Respondent, therefore, concludes that the pork and beans restriction did not give the foundation a retained power, right, or continuing interest over what petitioner purchased.

Respondent's analysis begs the question. It is clear that petitioner did not "purchase" the right to use the Stokely trademarks on pork and beans (for 20 years). It is equally clear that the foundation retained no right to continue to use the specific trademarks that were transferred to petitioner. However, the relevant statutory language of section 1253 refers to neither of these factors. Rather, section 1253(a) refers to a "transfer of a * * * trademark". This reference to

---

[12] Petitioner also argues that the exclusive right to use the Stokely trademarks on frozen foods held by United Foods, Inc., during 1984 and 1985, and the failure of petitioner to obtain exclusive rights in Europe or any rights in Canada were significant retained powers, rights, or continuing interests. Because of our findings with respect to the 5-year right to disapprove assignments and the pork and beans restriction, we need not consider petitioner's additional arguments.

the transfer of a trademark contemplates all transfers, including those with substantial restrictions and limited durations.[13]

Section 1253(a) states that such "transfer" "shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest *with respect to the subject matter of the * * * trademark*". (Emphasis added.) The subject matter of the Stokely trademarks included the ability to use them in the marketing of food products. Trademarks and trade names represent goodwill. *Philip Morris, Inc. v. Commissioner*, 96 T.C. 606, 634 (1991), affd. without published opinion 970 F.2d 897 (2d Cir. 1992). Goodwill is characterized as "the expectancy of continued patronage, for whatever reason." *Boe v. Commissioner*, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); see *Canterbury v. Commissioner*, 99 T.C. 223, 247 (1992); *Philip Morris, Inc. v. Commissioner, supra* at 634. Petitioner purchased the Stokely trademarks with the expectation that potential customers would be more likely to purchase petitioner's products if they were identified by the Stokely trademarks. Stokely trademarks could have been used to market pork and beans. Registration number 277,037 (one of the Stokely's Finest trademarks) expressly includes pork and beans within the products for which the trademark is to be used. The other two transferred trademarks have less detailed usage descriptions, but both could be used for pork and beans products. While petitioner acquired less than the full use of the Stokely trademarks, this was the direct result of the pork and beans restriction, through which the foundation was able to prevent petitioner from using the trademarks on pork and beans products.

The statute contains examples that show the error of respondent's reliance on the fact that petitioner did not purchase the right to use the trademarks on pork and beans. Section 1253(b)(2) lists several significant retained powers, rights, or continuing interests. One of these is the right of the transferor to disapprove any transfer. Sec. 1253(b)(2)(A). The purchaser of a trademark encumbered by this type of restriction clearly does not "purchase" the unencumbered

---

[13] That temporal limitations were contemplated in such transfers is clear from the language of sec. 1253(d)(2)(A) and (B), which refers to "the period of the transfer agreement", and sec. 1253(b)(3), which describes a "renewal of a franchise, trademark, or trade name" as a "transfer".

right to transfer the trademark. Nevertheless, it is clear that this type of restriction was to qualify as a retained power within the meaning of section 1253. Another example is the "right to prescribe the standards of quality of products used or sold". Sec. 1253(b)(2)(C). A transferee subject to such a right clearly does not purchase the right to use a trademark with respect to any product that it wishes. Yet, in this situation, the statute states that the transferor retains a significant power, right, or continuing interest. Sec. 1253(b)(2)(C).

Respondent argues that the pork and beans restriction is not a power, right, or continuing interest retained by the "transferor", since the foundation itself did not market pork and beans products. In the trademark transfer agreement, petitioner specifically acknowledged that its use of the trademarks for pork and beans products during the 20-year period would result in irreparable injury to the foundation and that injunctive relief for the foundation would be appropriate if petitioner violated this restriction. The foundation is a private entity controlled by Quaker Oats. Quaker Oats' control over the foundation also indicates that the restriction on petitioner's use of the Stokely trademarks on pork and beans products was a genuine restriction designed to protect Quaker Oats and the foundation.

Based on the foregoing factors, we find that the pork and beans restriction was a retained power, right, or continuing interest with respect to the subject matter of the Stokely trademarks.

## 2. *Were the Retained Powers, Rights, or Continuing Interests "Significant"?*

Petitioner's primary argument is that the foundation's right to disapprove assignment of the Stokely trademarks for 5 years is, as a matter of law, "significant". Section 1253(b)(2) states:

The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

The powers, rights, or continuing interests specified in section 1253(b)(2) are deemed significant by the terms of the statute. If a retained power, right, or continuing interest falls within the rights listed in section 1253(b)(2), no further inquiry is necessary. This list, however, is nonexclusive and does not preclude the possibility that other retained powers, rights, or continuing interests may be "significant".

Petitioner contends that the foundation's right to disapprove assignment of the Stokely trademarks for 5 years is "A right to disapprove any assignment of such interest, or any part thereof" within the meaning of subparagraph (A) of section 1253(b)(2). Respondent counters by pointing out that the foundation's right to disapprove assignments was limited to the 5-year period following the transfer, whereas petitioner's rights in the transferred trademarks were for an unlimited duration. Respondent therefore argues that the foundation's disapproval rights did not extend to "any assignment" within the meaning of the statute. In essence, the parties ask us to decide whether the words "any assignment" in the statute mean *all* assignments (suggested by respondent), or *some* assignments (suggested by petitioner).[14]

Respondent argues that "any assignment" means "all assignments" because any other interpretation would mean that every transitory right to disapprove an assignment would be deemed significant regardless of how short (or insignificant) the period during which the disapproval right could be exercised. In response, petitioner contends that if the period during which a transferor retains the right to disapprove an assignment is so short as to be meaningless, the courts could treat such a right as a sham and disregard it.

The parties' arguments present us with a conundrum. Subparagraph (A) refers to "*any* assignment of such interest, or *any* part thereof." (Emphasis added.) The second "any" in

---

[14] Webster's Third New International Dictionary (1986) defines "any" in several ways. It can mean "one or some". It can also mean "all".

subparagraph (A) can only mean "some". It would be arguably inconsistent to interpret the first "any" in a single sentence to mean "all" and the second "any" to mean "some". Yet, if the first "any" means "some", the interpretative problems noted by respondent arise.

The better course, and the one we adopt, is to interpret subparagraph (A) in light of the statute as a whole. Section 1253(b)(2) contains a list of retained rights upon which Congress conferred significance as a matter of law. Once a right falls within one of the specifically enumerated rights in subsection (b)(2), Congress intended that there should be no further inquiry into its significance.[15] However, unless the retained rights listed in subsection (b)(2) are coextensive in duration with the interest transferred, it can readily be seen that any one of them could be objectively insignificant if the time period during which the transferor could exercise such right was restricted. Courts would then be faced with the dilemma of either interpreting the statute in a way that would produce absurd results or making a case-by-case determination of the actual significance of whatever temporal limits had been placed on the retained right. Neither approach is satisfactory or in keeping with the legislative objective of subsection (b)(2). We believe, therefore, that the retained rights enumerated in subsection (b)(2) must be exercisable for a period of time that is coextensive with the duration of the interest that was transferred. This interpretation is consistent with the language in section 1253, the legislative history, and the objective of the statute.

The language of section 1253 makes a literal distinction between the object of a significant retained right referred to in subsection (a)[16] and the object of the specifically described rights in subsection (b)(2).[17] Section 1253(a) refers to retained rights "with respect to the *subject matter* of the franchise, trademark, or trade name." (Emphasis added.)

---

[15] See *Jefferson-Pilot Corp. v. Commissioner*, 98 T.C. 435, 447-450 (1992).

[16] Sec. 1253(a) provides:

SEC. 1253(a). GENERAL RULE.—A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest *with respect to the subject matter* of the franchise, trademark, or trade name. [Emphasis added.]

[17] Sec. 1253(b)(2) provides in part:

Significant power, right, or continuing interest.—The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights *with respect to the interest transferred*: [Emphasis added.]

While a transferred interest in a franchise, trademark, or trade name may itself have a specifically limited duration, the "subject matter" of these intangibles, including the goodwill associated with them, would not likely have an ascertainable limit. In contrast, section 1253(b)(2), which lists specifically defined rights, refers to rights retained "with respect to the *interest* transferred". (Emphasis added.) The "interest transferred" can encompass less than the subject matter of a franchise, trademark, or trade name. The "interest transferred" can be, and often is, for a limited period.[18] See S. Rept. 91-552 (1969), 1969-3 C.B. 423, 557 ("For purposes of this provision, a transfer is to include a transfer of *any interest (i.e., a part)* in a franchise, trademark or trade name."). (Emphasis added.) Thus, the duration of a retained right takes on added importance "with respect to the *interest* transferred" under subsection (b)(2). Our interpretation of the statute recognizes that importance.

The legislative history of section 1253 also emphasizes the importance of duration in regard to the retained rights enumerated in subsection (b)(2). It states:

> If the transfer agreement includes significant conditions or restrictions which are subject to the transferor's approval on a *continuing* basis, this power to exercise *continuing,* active, operational control over the transferee's business activities *is* to be considered as a retention by the transferor of a significant power, right, or continuing interest. * * * [S. Rept. 91-552, *supra,* 1969-3 C.B. at 556; emphasis added.]

The legislative history then lists six retained rights (found in section 1253(b)(2)) that, in the view of Congress, meet the above standards without question. *Id.* The focus of the legislative history on *continuing* control supports our interpretation that retained rights listed in subsection (b)(2) must be coextensive with the duration of the interest transferred.

One of the objectives of Congress in enacting section 1253 was to provide a simple, uniform method for determining whether the transfer of a trademark, franchise, or trade name should receive capital gains treatment. *Id.* Courts had

---

[18] For example, a typical restaurant franchise, which encompasses trademarks and trade names, is generally granted for a specified period of years. See *Canterbury v. Commissioner,* 99 T.C. 223, 243 (1992). As previously noted, sec. 1253(b)(3) defines "transfer" to include "the *renewal* of a franchise, trademark, or trade name" (emphasis added), and subsec. (d)(2)(A) allows for an amortization period of less than 10 years if the interest transferred was for a period of less than 10 years. See *supra* note 13.

previously conducted detailed factual analyses of such transfers to determine the significance of rights retained by the transferor. These factual analyses led to divisions of authority among courts about the significance of many retained rights. *Id.* Subsection (b)(2) was intended to end this diversity. *Id.* If, as suggested by petitioner, the duration of the retained rights listed in subsection (b)(2) need not be coextensive with the duration of the interest transferred, two potential interpretative scenarios follow.

Under the first scenario, a retained right listed in subsection (b)(2) would be deemed significant regardless of its duration. If we were to adopt this approach, a 1-month or 1-week right to disapprove the assignment of a 20-year franchise would, as a matter of law, be considered significant for purposes of section 1253(b)(2). The same problem exists with respect to the other six rights enumerated in section 1253(b)(2). For example, restaurant franchises are typically granted for a limited period. See *Canterbury v. Commissioner,* 99 T.C. at 243. If such a franchise gave the transferor a right to terminate at will that could only be exercised in the first month of a 20-year franchise, such a right would probably be objectively insignificant but would nonetheless automatically qualify as significant if we adopted petitioner's approach.[19] This is clearly not what Congress intended, S. Rept. 91-552, *supra,* 1969-3 C.B. at 555-556, and could easily lead to absurd results. See *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 120 (1991) (interpretation of statutory language should not lead to "'absurd or futile'" results "'plainly at variance with the policy of the legislation as a whole'" (quoting *United States v. American Trucking Associations,* 310 U.S. 534, 543 (1940))).

Under the second scenario, a retained right listed in subsection (b)(2) might or might not have significance, depending upon an analysis of the facts and circumstances in order to determine whether its duration was adequate. This type of analysis leads directly back to the problems and resulting uncertainty that existed prior to the enactment of section

---

[19] A franchisor (transferor) also typically retains rights to prescribe standards of quality and service. See, e.g., *Canterbury v. Commissioner, supra* at 236. This is the type of power referred to in sec. 1253(b)(2)(C). If, however, the franchisor retained such a right for just the first month of a 20-year franchise, it would probably be absurd to label such a right or power as "significant".

1253, and therefore, subverts the intent of Congress. See S. Rept. 91-552, *supra,* 1969-3 C.B. at 555.

Based on the foregoing analysis, we hold that those powers, rights, or continuing interests retained by a transferor that are enumerated in subsection (b)(2) must be coextensive with the duration of the interest transferred. It follows that the foundation's 5-year transfer disapproval right is not a significant right within the meaning of section 1253(b)(2).

This does not mean that the foundation's disapproval right is not significant for purposes of section 1253(a). The list in subsection (b)(2) is nonexclusive, and therefore, retained rights not included in subsection (b)(2) may still qualify under subsection (a) so as to entitle petitioner to amortize its payment. Whether a retained right not specifically enumerated in section 1253(b)(2) is "significant" for purposes of section 1253(a) must be determined in light of all the facts and circumstances at the time of the transfer.

There is very little evidence regarding the impact on petitioner as a result of the 5-year disapproval right. The parties presented no evidence regarding the circumstances that supplied the motivation for including the 5-year disapproval right in the transfer agreement. Absent such evidence, we are unprepared to find that this disapproval right, on its own, should be characterized as a significant power, right, or continuing interest for purposes of section 1253(a).

Petitioner next argues that the 20-year restriction on using the Stokely trademarks on pork and beans products is itself a "significant" retained power, right, or continuing interest. Respondent contends that this restriction is not significant for two reasons. First, respondent asserts that the name "Stokely" is barely visible on Quaker Oats' well-known line of Van Camp's pork and beans products. This, according to respondent, belies the claim that the Stokely trademarks could have been used by petitioner to successfully market pork and beans products. Second, respondent notes that petitioner was not in the business of producing pork and beans products at the time it entered the transaction to acquire the trademarks. From this, respondent argues that the restriction had no significance for petitioner's business or its use of the Stokely trademarks. We disagree.

The restriction clearly had significance for Quaker Oats. The specific reason for its inclusion in the contract was to

protect the company's Van Camp's line. Because of the close connection in the public mind between the Van Camp's and Stokely names, Quaker Oats' management believed that the Van Camp's mark would be "seriously diluted", and Quaker Oats' sales of pork and beans products materially and adversely affected, if petitioner were allowed to use the Stokely trademarks for these products. On brief, respondent agrees that the Stokely and Van Camp's names have been associated with one another in the minds of the public. Thus, it is probable that the use of the Stokely trademarks on pork and beans products would have had considerable importance in any effort by petitioner to market such products.

Moreover, petitioner wanted to enter into the market for pork and beans. Petitioner initially approached Quaker Oats regarding the purchase of the Stokely-Van Camp's trademark, but was rejected. Petitioner wanted to use the Stokely trademarks on pork and beans products and would have done so but for the restriction. Despite the restriction, petitioner attempted to sell pork and beans for a short period under another label. Petitioner was forced to abandon its plans for that market due to the lack of a strong brand name. Stokely could have been that name.

As of June 1983, SVC, using the Van Camp's label, had a 33-percent share of the canned pork and beans market in the United States totaling about $150 million annually in sales. During the years after the trademark transfer. agreement between the foundation and petitioner, Quaker Oats' share of the U.S. market for pork and beans was 28 percent. The dollar amounts of this share in recent years were as follows:

| *Fiscal year* | *Sales* |
| --- | --- |
| 1986 | $123,000,000 |
| 1987 | 126,000,000 |
| 1988 | 134,000,000 |
| 1989 | 132,000,000 |

In 1983, petitioner's net sales for all its products, including those on which the Stokely trademarks were used, were

$43,900,000. In recent years, petitioner's net sales were as follows:

| Fiscal year | Net sales |
| --- | --- |
| 1986 | $139,700,000 |
| 1987 | 159,800,000 |
| 1988 | 188,800,000 |
| 1989 | 214,600,000 |

In light of these facts, the pork and beans restriction carried undoubted significance for the foundation, Quaker Oats, and petitioner. The trademark transfer agreement states this clearly:

[Petitioner] recognizes and acknowledges that such use of The Trademarks before expiration of the applicable time period would result in immediate and irreparable injury to the FOUNDATION, which could not be adequately compensated by payment of money damages, and hence injunctive relief would be appropriate in favor of the FOUNDATION or its designees to prevent use of The Trademarks in such manner.[20]

Respondent contends that section 1.1253-2(d)(9), Proposed Income Tax Regs., 36 Fed. Reg. 13159 (July 15, 1971), requires a different conclusion. Proposed regulations constitute a body of informed judgment on which courts may draw for guidance, but do not carry the weight of a final regulation. *Bolton v. Commissioner*, 694 F.2d 556, 561 n.10 (9th Cir. 1982), affg. 77 T.C. 104 (1981). They are considered to be nothing more than respondent's position for purposes of litigation. *F. W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265-1266 (1970).

Section 1.1253-2(d), Proposed Income Tax Regs., *supra,* lists nine rights that are considered to be "significant". Six of the rights listed in the proposed regulations are identical to those listed in section 1253(b)(2). The right listed in section 1.1253-2(d)(9), Proposed Income Tax Regs., *supra,* is: "Any other right which permits the transferor to exercise continuing, active, and operational control over the transferee's trade or business activities." Respondent argues that active, operational control is the sine qua non of significance. We observe, however, that the proposed regulation itself

[20] Respondent argues that the pork and beans restriction has no significance with regard to the foundation because the foundation has no competitive or economic interest in the pork and beans market. As previously explained, the foundation is a private entity controlled by Quaker Oats, which did market pork and beans.

belies respondent's conclusion. It introduces its list with the caveat that "The term 'significant power, right, or continuing interest' *includes, but is not limited to,* the following rights". See sec. 1.1253-2(d), Proposed Income Tax Regs., *supra* (emphasis added).

Respondent points to the Senate Finance Committee report and its reference to powers, rights, or interests allowing the transferor "active, operational control" and argues that, in contrast to this language, the pork and beans restriction does not grant such control to the foundation. However, the Senate Finance Committee report also indicates that "any general control of the transferee's activities and operations by the transferor", S. Rept. 91-552, *supra,* 1969-3 C.B. at 555, can be significant. We believe the pork and beans restriction allows the foundation control of the transferee's activities and operations in that it prevents petitioner from using its trademarks for a significant market that petitioner could have and would have otherwise entered.[21] This constitutes a "significant [condition] or [restriction]". See *id.,* 1969-3 C.B. at 556.

We recognize that the pork and beans restriction is not coextensive with the duration of petitioner's rights in the trademarks. The restriction lasts for 20 years, whereas petitioner acquired its right, title, and interest in the trademarks in perpetuity.[22] Section 1253(a) provides that a transfer "not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the *subject matter of the franchise, trademark, or trade name.*" (Emphasis added.) As previously noted, the subject matter of a trademark may be broader than the "interest transferred" referred to in section 1253(b)(2). Section 1253(a) is therefore distinguishable from section 1253(b)(2).[23] Unlike section 1253(b)(2), section

---

[21] A transferor's retained right to disapprove any assignment of a trademark is clearly a retained power, right, or continuing interest pursuant to sec. 1253(b)(2)(A), even though such a right may not allow control over the details of a transferee's actual everyday business functions. The pork and beans restriction confers control over petitioner's business that is analogous to the control conferred by a right to disapprove assignment of an interest in a trademark. Sec. 1253(b)(2)(A).

[22] Trademark rights are property under principles of the common law. *Trade-Mark Cases,* 100 U.S. 82, 92 (1879). Federal registration of a trademark remains in force for 10 years (20 years during the years here at issue), 15 U.S.C. sec. 1058(a), but can be renewed. 15 U.S.C. sec. 1059. Respondent makes no argument that the 20-year life of the restriction renders it insignificant.

[23] We have previously held that the retained powers, rights, or continuing interests specifically enumerated in sec. 1253(b)(2) must be coextensive in duration with the "interest transferred".

1253(a) contains no specifically enumerated criteria for determining the significance of a retained right. While the duration of a restriction may be an important factor, the ultimate determination of whether a retained right is "significant" for purposes of section 1253(a) must be based on all the facts and circumstances. In the context of petitioner's business, 20 years is a significant period.

We have examined all the facts and circumstances regarding the Stokely trademarks and the pork and beans restriction and conclude that the pork and beans restriction qualifies as a "significant power, right, or continuing interest with respect to the subject matter of the * * * [trademarks]" within the meaning of section 1253(a). As a result, petitioner is entitled to deductions that it claimed under section 1253(d)(2).

*Decision will be entered under Rule 155.*

---

The subject matter of a franchise, trademark, or trade name has no temporal limitation per se. Thus, whether a retained right in the subject matter of a trademark is significant is not necessarily determined by its duration.