NABISCO BRANDS, INC. AND CONSOLIDATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nabisco Brands v. Commissioner
Docket No. 26644-91
United States Tax Court
T.C. Memo 1995-127; 1995 Tax Ct. Memo LEXIS 128; 69 T.C.M. (CCH) 2230; March 27, 1995, Filed *128 Decision will be entered under Rule 155. This case involves the acquisition of the Life Savers Cos. (LS) by Nabisco Brands, Inc. (P). In 1981, P bought the LS trademarks and the LS business from Squibb. P paid a total of $ 53,746,648 for the LS trademarks, consisting of a $ 25 million initial payment and 10 annual payments totaling $ 28,746,648. P amortized the initial payment and deducted the annual payments under sec. 1253, I.R.C.
R concedes that about 25 percent of the annual payments are contingent on the productivity, use, or disposition of the trademarks, and, therefore, that P may deduct that portion of the payments under sec. 1253(d)(1), I.R.C.
Held, P's initial and annual payments are deductible under sec. 1253(d)(2), I.R.C., because the contingent payments were a substantial element under the transfer agreement within the meaning of sec. 1253(b)(2)(F), I.R.C., and therefore Squibb retained a significant power, right, or continuing interest in the trademarks under sec. 1253(a), I.R.C.
For petitioner: Wayne S. Kaplan, Thomas Kittle-Kamp, David A. Hyman, William A. Schmalzl, Joel V. Williamson, Stephen D. Katzman, and Jeffrey B. Frishman. For respondent: William *129 S. Garofalo and Phillip A. Pillar. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in petitioner's Federal income tax of $ 2,016,773 for 1982 and $ 2,223,929 for 1983. Petitioner bought the Life Savers trademarks in 1981 as part of its purchase of the Life Savers business from Squibb, Inc. (Squibb). After concessions, the sole issue for decision is whether petitioner's payments to Squibb for the Life Savers trademarks are deductible under section 1253[1] in an amount greater than allowed by respondent. We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
In 1982 and 1983, Nabisco Brands, Inc. (Nabisco), was the parent of the Nabisco group, an affiliated group of corporations (petitioner). Nabisco is a Delaware corporation. Its principal office was in Parsippany, *130 New Jersey, when it filed the petition. The Nabisco group was formed on July 6, 1981, when corporations headed by Nabisco, Inc., and Standard Brands Inc., were combined. Following the combination, petitioner was one of the Nation's largest producers and distributors of foods, food ingredients, confectioneries, and beverages. On September 10, 1985, R.J. Reynolds Industries, Inc., bought the Nabisco group and changed its name to RJR Nabisco. 2. Selecting a Buyer for the Life Savers Group
In 1981, Squibb was a health care and consumer products company unrelated to the Nabisco group. Life Savers was one of Squibb's subsidiaries. Life Savers made and marketed several leading brands of hard candies such as Life Savers and Breath Savers, chewing gums such as Care*Free, Bubble Yum, Replay, and Beech-Nut, and other products. During the 1970's, Squibb decided to concentrate on its health care business. Squibb decided in early 1981 to sell the Life Savers group. In April 1981, Squibb employed the investment banking firm of Brown Bros. Harriman & Co. (Brown Bros.) to help it sell the Life Savers group. By July 1981, Brown Bros. had approached several possible buyers of the Life *131 Savers group, including Rowntree Mackintosh Ltd. (Rowntree) (a leading United Kingdom foods company) and petitioner. 3. Petitioner's Consideration of Acquisition of the Life Savers Group
The first meeting between petitioner and Brown Bros. regarding petitioner's possible purchase of the Life Savers group was on July 30, 1981. Attending for petitioner were H.F. Powell (Powell), a Nabisco senior vice president and its principal financial negotiator for corporate acquisitions and divestitures; and Dean Posvar (Posvar), a Nabisco vice president who headed its business planning department. Posvar recommended to petitioner's top management that petitioner seriously consider buying the Life Savers group and that it study the possible acquisition more intensively. F. Ross Johnson, petitioner's chief operating officer, approved this recommendation in September 1981. Petitioner began a detailed study of the contemplated purchase. On October 5 and November 2, 1981, Squibb gave petitioner financial statements for 1979 and 1980, and performance reports through Life Savers' third quarter of 1981. Squibb had given petitioner its 1981 third quarter sales projections earlier. In its *132 estimates for the third quarter of 1981, Squibb underestimated domestic sales by Life Savers by $ 338,000 out of total sales of $ 75,613,000. Petitioner engaged the consulting firm of MCA Development Agency (MCA) to make a comprehensive market analysis of the Life Savers group. The MCA analysis included much of the data Squibb had provided earlier and additional data. It included analyses of confections markets, consumers, competition, and advertising and promotion. 4. Negotiations to Buy the Life Savers Trademarks
Petitioner believed the Life Savers trademarks were indispensable to Life Savers' business success. Petitioner would not have bought the Life Savers group if it could not also buy the Life Savers trademarks. Petitioner preferred to buy Life Savers' assets, primarily to avoid assuming Life Savers' liabilities. Squibb preferred to sell Life Savers' stock so it would transfer Life Savers' liabilities to petitioner. Petitioner's principal negotiators were Powell, who handled the financial aspects of the negotiations, and Keith Thompson (Thompson), from Nabisco's legal department. J. Thomas Pearson (Pearson), Nabisco's vice president for taxation, also assisted *133 petitioner. Squibb's principal negotiators were J. Elliston Murray, Squibb's controller, who handled the financial aspects of the negotiations for Squibb, and Daniel Cuoco, Squibb's assistant general counsel. Pearson suggested to Powell and Thompson that petitioner buy the Life Savers trademarks in a way that would permit it to deduct the purchase price of the trademarks under section 1253. Pearson suggested a separate sale of the Life Savers trademarks. Powell proposed to Squibb that petitioner buy the Life Savers trademarks. Squibb did not accept that proposal when it was first raised. The prospective buyers of the Life Savers group submitted written bids to Squibb on November 6, 1981. Petitioner bid $ 227 million for the stock of the Life Savers group. After it received the bids, Squibb told petitioner and Rowntree that it would choose one of them to buy the Life Savers group. Squibb, however, wanted to negotiate further. Squibb wanted to obtain the highest possible price for the Life Savers group and to sell it by the end of 1981. Squibb wanted substantial deferred payments rather than immediate cash for the Life Savers group. Petitioner and Squibb were initially unable *134 to agree on the price for the Life Savers group. Pearson concluded that a separate purchase of the Life Savers trademarks, if structured to comply with section 1253, would generate future tax deductions for petitioner with a 1981 present value of about $ 9 million; this would let petitioner raise its offering price and enhance its prospects of outbidding Rowntree. Petitioner raised the amount it was willing to pay for the Life Savers group by $ 18 million. Squibb knew that petitioner intended to obtain a tax benefit under section 1253 from the trademark agreement. Both parties believed that if they structured the Life Savers' sale to comply with section 1253, Squibb would treat the payments as ordinary income rather than long-term capital gain. 5. The Purchase Agreement
Squibb chose petitioner to buy the Life Savers group. As a result of the negotiations, Squibb and petitioner agreed to structure the transaction as a sale of the shares of Life Savers and other members of the Life Savers group, and a separate sale of the Life Savers trademarks for an initial payment of $ 25 million and annual payments for 10 years. The parties designed the annual payments formula to *135 reduce Squibb's risk by varying the payment rate based on the amount of sales, [2] and by providing for higher annual payment rates in the first 5 years than in the second 5 years, as follows: Sales
Contingent payment
Contingent payment
(in millions)
% rate--years 1-5 % rate--years 6-10
From:
To: 0
$ 50
2.10
1.75
$ 50
75
1.70
1.40
75
100
1.50
1.25
100
125
1.25
1.05
125
150
1.05
.90
150
175
.75
.60
175
200
.65
.55
200
225
.55
.45
225
250
.40
.35
250
275
.30
.25
275
300
.20
.20
300
and over
.01
.01
Petitioner projected that its annual payments under the formula would be more than 50 percent of the amount that it would pay for the trademarks, and thus it would comply with section *136 1253(b)(2)(F), as interpreted by section 1.1253-2(d)(6), Proposed Income Tax Regs., 36 Fed. Reg. 13148, 13151 (July 15, 1971). Pearson believed that the annual payments would total more than $ 25,000,000, and thus the 50-percent requirement of the proposed regulation would be met, and that petitioner would pay little on sales above Life Savers' historical level (approximately $ 275 million) on the theory that future sales above that level would result from petitioner's efforts. The parties expected that sales of the trademarked products would be at least as great through the term of the trademark agreement as they were in 1981 ($ 271.2 million) and that petitioner's 10 annual payments to Squibb would be at least $ 28,208,000. [3] That amount is more than 50 percent of petitioner's total estimated payments for the trademarks. [4]
*137 The annual payments that Squibb was to receive under the trademark agreement would vary to some extent based on the levels of petitioner's future sales of the trademarked products. For example, if sales fell by $ 78,200,000 to $ 193 million, annual payments would fall by $ 346,600 for the first 5 years and $ 291,500 for the second 5 years. [5]
The parties executed the purchase agreement on November 13, 1981. In December 1981, the boards of directors of the various companies approved petitioner's acquisition of the Life Savers group. On December 29, 1981, Life Savers assigned and distributed to Squibb the Life Savers trademarks and the stock of two foreign subsidiaries. The Life Savers acquisition closed on December 31, 1981, and January 4, 1982. At the first closing, Squibb sold the stock of Life Savers to a *138 Nabisco subsidiary and the Life Savers trademarks to petitioner. The second closing involved the sales of various foreign subsidiaries in the Life Savers group. 6. Terms of the Trademark Agreement
a. Best Efforts Clause
The trademark agreement required petitioner to use its reasonable best efforts to maintain or increase sales of Life Savers products (best efforts clause). [6] The best efforts clause was important to Squibb, which was concerned about its financial risk. Petitioner believed that Squibb could sue under the best efforts clause if, for example, petitioner intentionally reduced sales of the trademarked products. b. The 33-Percent Option
The trademark agreement *139 included an elective remedy to encourage petitioner to maintain or increase sales of trademarked products. Squibb could elect the remedy if sales of any of the trademarked products fell below 33 percent of the 1981 sales level. [7] If sales fell below 33 percent of the 1981 level, Squibb could: (i) Continue to accept annual payments from petitioner under the annual payments formula based on actual sales of the affected product, or (ii) require petitioner to make payments under the annual payments formula based on the 1981 sales of the affected product (the 33-percent option). If Squibb elected the 33-percent option, petitioner would pay Squibb for that year and for all remaining years of the trademark agreement based on 1981 sales. *140 The 33-percent option was intended to accommodate Squibb's desire to secure its expected future payments and petitioner's desire not to have Squibb interfere in its business operations. Sales of Life Savers products subject to the trademark agreement totaled $ 271.2 million in 1981. If Squibb had elected the 33-percent option based on $ 271.2 million of sales, petitioner's annual payment to Squibb would have been $ 3,076,100 [8] for the first 5 years of the agreement and $ 2,565,500 for the second 5 years. Squibb and petitioner did not know Life Savers' total 1981 sales when they agreed to the 33-percent option. However, they knew that sales were $ 279.4 million in 1980 and $ 279.9 million in 1979. *141 Petitioner and Squibb believed that, absent petitioner's neglect or mismanagement, circumstances would have to have been very different from what petitioner and Squibb forecast for sales to drop by more than two-thirds from the 1981 level. If such a drop had appeared imminent, the 33-percent option gave petitioner an incentive to stem the decline. c. Transfer Option
Squibb had two options under the trademark agreement if petitioner proposed to transfer any of the Life Savers trademarks or business to a third party. Squibb could: (i) Continue to accept annual payments from the third party under the annual payments formula based on actual sales of the transferred product, or (ii) require petitioner to continue making annual payments based on 1981 sales of the transferred product (the transfer option). [9] The transfer option also let Squibb receive payments based on 1981 sales if petitioner stopped selling any of the Life Savers products. *142 d. Points Relating to Both the 33-Percent Option and the Transfer Option
Petitioner and Squibb made no agreement about whether Squibb would elect under the 33-percent option or the transfer option if either became exercisable. The trademark agreement required petitioner to certify sales of trademarked products and calculate its payments to Squibb each year. [10] For the first 5 years (1982 through 1986), petitioner reported total sales of all trademarked products, not total sales of each trademarked product. In 1987, petitioner began to report total sales of each trademarked product. Squibb did not exercise the 33-percent option or the transfer option even though sales of several trademarked products fell below 33 percent of their 1981 levels during the term of the trademark agreement. [11]
*143 7. Life Savers' Sales
Petitioner's analysts believed that Squibb had neglected Life Savers for several years and overpriced Life Savers' products. Petitioner believed this caused Life Savers sales to decline from 1979 to 1981 and that the decline was reversible with good management. The net sales of trademarked products on which petitioner's annual payments to Squibb were based (or, for years before 1982, upon which such payments would have been based if the agreement had been in effect) were as follows: Sales Sales Year
(in millions)
Year
(in millions)
1973
$ 99.5
1983
$ 283.0
1974
120.0
1984
303.7
1975
156.8
1985
306.7
1976
198.9
1986
305.2
1977
256.4
1987
349.6
1978
277.8
1988
373.1
1979
279.9
1989
385.1
1980
279.4
1990
395.6
1981
271.2
1991
415.9
1982
266.5
Life Savers had strong trademarks and established market shares in 1981. Petitioner and Squibb expected sales of the trademarked products to increase during the term of the trademark agreement. However, this was not guaranteed. Life Savers' sales revenues increased from 1973 to 1979, but dropped by 4.8 percent from 1979 to 1982. Life Savers spent less *144 on advertising and promotion in 1979 and 1980 than its competitors. As shown by the following charts, from 1977 to 1980 the number of units of Life Savers' products sold in the United States declined, but sales revenues increased: Life Savers U.S. Sales: Unit Volume
(millions of boxes)
1977 1978 1979 1980 Life Savers candy
38.9
33.4
30.7
27.5
Breath Savers
0.8
0.9
3.5
4.2
Sweet Nothings
1.2
1.8
Lollipops
3.7
3.9
4.2
3.7
Care*Free
30.9
31.0
27.2
21.6
Supradent
1.6
Replay
1.5
Bubble Yum
26.7
24.8
21.5
16.9
Beech-Nut gum
5.6
3.8
3.0
2.3
Fruit Stripe gum
3.7
3.8
2.3
1.6
Life Savers gum
1.3
0.2
--
--
Vend
12.4
13.7
12.1
9.9
Military
3.5
3.8
3.6
3.4
Other
3.1
2.2
2.0
1.8
Total units sold
130.6
121.5
111.3
97.8
Life Savers U.S. Sales: Revenues
(millions of dollars)
1977 1978 1979 1980 Life Savers candy
$ 67.9
$ 74.6
$ 80.5
$ 76.6
Breath Savers
0.9
2.2
12.2
17.8
Sweet Nothings
5.3
6.9
Lollipops
8.7
8.7
7.8
7.8
Care*Free
59.3
72.4
67.7
61.6
Supradent
5.4
Replay
4.3
Bubble Yum
75.0
69.9
61.4
58.4
Beech-Nut gum
8.3
6.7
5.7
4.5
Fruit Stripe gum
5.7
7.0
4.5
2.9
Life Savers gum
1.7
--
--
--
Vend
15.9
22.2
21.2
18.7
Military
6.2
8.2
8.2
8.9
Other
6.8
5.9
5.4
5.5
Total units sold
256.4
277.8
279.9
279.3
*145 The market share of Life Savers candy fell from just under 40 percent in 1976 to about 31 percent in 1980. Sales revenues were $ 66.7 million in 1976, and $ 76.6 million in 1980. Care*Free sugarless chewing gum was introduced in 1966. It declined in unit volume and revenues from 1978 to 1980 because it was reformulated without saccharin and there was a lack of marketing support for it. Sales of Bubble Yum, a soft sugared bubble gum which was introduced nationally in 1976, dropped from 1977 to 1980 and again in recent years in part because of competition from American Chicle's Bubblicious (introduced in 1977) and Wrigley's Hubba Bubba (introduced in 1979). From 1981 to 1991, Bubble Yum sales were relatively stable. Sales of several of Life Savers' lesser products declined. Sales of Beech-Nut chewing gum, introduced in the 1920's or 1930's, fell from $ 16 million in 1975 to $ 4.5 million in 1980. Sales of Fruit Stripe chewing gum, introduced in the 1920's or 1930's, fell from $ 9.1 million in 1975 to $ 2.9 million in 1980. Sales of Life Savers chewing gum, introduced in 1973, dropped from $ 8.3 million in 1973 to $ 1.7 million in 1977. The product was discontinued in 1978. *146 Sales of Replay chewing gum fell from about $ 7 million in 1981 until it was discontinued in 1988. Sales of Supradent, Sweet Nothings, Life Savers Sours, and Sour Bites were discontinued in 1985. Sales of Pine Bros. candy were discontinued in 1989. 8. Business Risks for Life Savers Products
Life Savers operated in competitive markets. Its sales were subject to the usual risks of other businesses. When petitioner bought Life Savers, the exposure of the trademarked products to business risks was similar to that of other successful trademarked products. A buyer of a product or a business cannot predict the future with certainty; acquired products sometimes fail. Life Savers' products faced several business risks, including competition from other rack goods and new products, management decisions, cannibalization, [12] pricing strategies, and general business risks, such as changing customer tastes and production or distribution problems. *147 9. Tax Treatment of the Trademark Payments by Petitioner and Squibb
Petitioner made 10 annual payments to Squibb under the trademark agreement. Petitioner paid the following amounts: Year
Amount
1982 $ 3,062,189
1983 3,103,544
1984 3,137,875
1985 3,138,168
1986 3,138,025
1987 2,629,964
1988 2,632,312
1989 2,633,418
1990 2,634,560
1991 2,636,593
Total
[13] 28,746,648
Petitioner amortized the $ 25 million initial payment over 10 years and deducted the annual payments. Petitioner's total deduction under section 1253 was $ 5,562,189 ($ 2,500,000 + $ 3,062,189) for 1982 and $ 5,603,544 ($ 2,500,000 + $ 3,103,544) for 1983. Respondent disallowed petitioner's amortization of the initial payment and deduction of costs to acquire the Life Savers trademarks. [14]
*148 Squibb reported the $ 25 million initial payment and the annual payments as ordinary income for income tax purposes. Respondent has not challenged Squibb's reporting of any of the payments as ordinary income. Squibb was more concerned with guaranteeing payments under the trademark agreement than with the tax treatment of those payments. In 1989, Squibb filed a claim for its 1981 taxable year seeking a refund of $ 10,325,167 in Federal income tax based on Squibb's reclassification of the $ 25 million initial payment for the Life Savers trademarks as a long-term capital gain. Respondent denied Squibb's claim. Squibb filed a protest with respondent's Appeals Office. To date respondent has not granted Squibb's protest. OPINION 1. Introduction
This case involves the sale of Life Savers trademarks for an initial payment and 10 annual payments. The sole issue is whether for 1982 and 1983 petitioner may amortize the $ 25 million initial payment and deduct the annual payments it made to buy the Life Savers trademarks under section 1253. [15]
*149 Section 1253 provides that costs of acquiring a trademark may be deducted or amortized. Generally, whether a taxpayer may deduct or amortize trademark acquisition costs under section 1253 depends on the terms of the trademark purchase and the seller's degree of involvement in the buyer's business after the sale. A taxpayer may deduct payments for acquiring a trademark that are contingent on the productivity, use, or disposition of the trademark. Sec. 1253(d)(1). [16] *151 A noncontingent single payment discharging a principal sum agreed upon in the transfer agreement may be amortized over a 10-year period if the transfer of the trademark is not treated as a sale or exchange of a capital asset under section 1253(a). Sec. 1253(d)(2)(A). A transfer of a trademark is not a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the trademark. Sec. 1253(a). [17] A right to receive payments contingent on the productivity, use, or disposition of the subject matter of the trademark transferred is significant for purposes of section 1253(a) if the payments are a substantial element under the transfer *150 agreement. Sec. 1253(b)(2)(F). The parties raise the following issues: (a) Contingent Payments Issues: Whether, as respondent contends, $ 1,692,420 of each annual payment in 1982 and 1983 [18] was not contingent on the productivity, use, or disposition of the Life Savers trademarks because either: (i) The 33-percent option effectively guaranteed that those amounts were minimum payments; or (ii) those amounts were not contingent on the productivity, use, or disposition of the Life Savers trademarks because of the annual payments formula and Life Savers' financial history and business operations; and (b) Significant Powers Issues: Whether, as petitioner contends, Squibb retained a significant power, right, or continuing interest in the Life Savers trademarks under the trademark agreement for any of the following reasons (the significant powers issues): *152 (i) The portions of petitioner's estimated annual payments for the Life Savers trademarks that respondent concedes were contingent were a substantial element of the agreement under section 1253(b)(2)(F); (ii) petitioner's obligations and Squibb's rights under the best efforts clause were a significant power not listed in section 1253(b)(2); (iii) the 33-percent option gave Squibb a significant power not listed in section 1253(b)(2); or (iv) the various powers, rights, and interests that Squibb retained with respect to the Life Savers trademarks collectively were a significant power not listed in section 1253(b)(2). *153 The parties agree that if petitioner prevails on either of the contingent payments issues or any of the four significant powers issues petitioner's annual payments for the Life Savers trademarks are fully deductible under section 1253(d)(1) and (d)(2), and the initial payment for the Life Savers trademarks may be amortized over 10 years under section 1253(d)(2). As discussed below, we conclude that petitioner prevails under the first of the significant powers issues. Thus, we need not consider any of the other issues. 2. Did Squibb Retain Any Significant Powers, Rights, or Continuing Interest in the Trademarks?
Petitioner contends that Squibb retained various significant powers, rights, or continuing interests (SPRI) with respect to the Life Savers trademarks under the trademark agreement. Payments that are contingent on the productivity, use, or disposition of a trademark are an SPRI if the payments are a substantial element under the transfer agreement. Sec. 1253(b)(2)(F). [19] *154 Section 1253 does not define "substantial". [20]
Respondent concedes that about 25 percent of the payments under the trademark agreement were contingent, on the theory that payments above those which respondent contends were guaranteed by the 33-percent option were contingent. [21] Petitioner argues that 25 percent is a substantial element under the statute, and that the contingent payments were deductible because they were an SPRI under section 1253(b)(2)(F). *155 Petitioner maintains that contingent payments which are more than 20 percent of the consideration paid for trademarks are substantial. Petitioner points out that quantitative definitions of "substantial" abound in the tax field, and that 25 percent is toward the high end of the accepted range. [22]
*156 We agree that 25 percent is substantial in the present context. Whether contingent payments are a substantial element of the transfer agreement under section 1253(b)(2) is decided based on all of the facts and circumstances. See Stokely USA, Inc. v. Commissioner, 100 T.C. 439, 453 (1993). We apply the plain meaning of substantial. [23]Zinniel v. Commissioner, 89 T.C. 357, 363-364 (1987); Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984). Substantial means "of considerable value; valuable * * *. Something worthwhile as distinguished from something without value or merely nominal." Black's Law Dictionary 1428 (6th ed. 1990). It is difficult to view payments ranging from $ 1.4 to $ 1.6 million annually, constituting 25 percent of the total payments, as insubstantial. We hold that petitioner's payments were a substantial element under the transfer agreement within the meaning of section 1253(b)(2)(F). *157 Because we find for petitioner on this issue, we need not reach the other issues. We hold that petitioner's payments to Squibb are fully deductible under section 1253. To reflect concessions, Decision will be entered under Rule 155. Footnotes
1. Section references are to the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. To illustrate how the different percentage rates affect petitioner's payments to Squibb during the first 5 years, petitioner would pay Squibb $ 21,000 for each $ 1 million of sales between zero and $ 50 million, and $ 100 for each $ 1 million of sales over $ 300 million.↩
3. The $ 28,208,000 figure is based on actual dollars, not present value. The total amount of the 10 annual payments was $ 28,746,648. See par. 9, infra↩ p. 18.
4. Nabisco also made a $ 25 million initial payment for the trademarks. Thus: $ 28,208,000 / $ 28,208,000 + $ 25,000,000 = 53%↩
5. Sales of $ 193 million would produce an annual payment of $ 2,729,500 in each of the first 5 years and $ 2,274,000 in each of the second 5 years. ($ 2,729,500 x 5) + ($ 2,274,000 x 5) = $ 25,017,500.↩
6. Sec. 3(b) of the trademark agreement (the best efforts clause) provides: (b) NBI will use its reasonable best efforts under the circumstances to maintain or increase current levels of sales of the Trademarked Products, provided that this will not restrict any good faith decisions as to pricing, marketing and promotion.↩
7. Sec. 3(c) of the trademark agreement (the 33-percent option) provides: (c) Further, to assure that NBI will continue to use its best efforts to maintain or increase sales of Trademarked Products, NBI agrees that if during any Payment Year net U.S. sales of any of the Trademarked Products sold on the date hereof fall below 33% of the amount of the net U.S. sales of such Trademarked Products during 1981, then Squibb shall have the option of having such 1981 sales being considered as the net U.S. sales of such Trademarked Products for such year in which such sales fall below 33% and for each subsequent Payment Year.↩
8. Based on 1981 sales of $ 271.2 million, the annual payments would be calculated as follows: Sales
First 5 years
Second 5 years
$ 50 million x
.021
=
$ 1,050,000
x
.0175
=
$ 875,000
25 million x
.017
=
425,000
x
.014 =
350,000
25 million x
.015
=
375,000
x
.0125
=
312,500
25 million x
.0125
=
312,500
x
.0105
=
262,500
25 million x
.0105
=
262,500
x
.009 =
225,000
25 million x
.0075
=
187,500
x
.006 =
150,000
25 million x
.0065
=
162,500
x
.0055
=
137,500
25 million x
.0055
=
137,500
x
.0045
=
112,500
25 million x
.004
=
100,000
x
.0035
=
87,500
21.2 million
x
.003
=
63,600
x
.0025
=
53,000
271.2 million
Total
3,076,100
Total
2,565,500
See chart in par. 7, infra↩ p. 15, for the net sales of trademarked products on which Nabisco's annual payments to Squibb were based.
9. Sec. 3(c) of the trademark agreement (the transfer option) provides: (c) During the Payment Period NBI may discontinue sales under any of the U.S. Trademarks, or it may sell, assign, license or otherwise transfer any U.S. Trademark to any other person, or it may sell the business using the U.S. Trademarks, provided, that, if such business is sold, or if any U.S. Trademark is discontinued or is sold, assigned, licensed (in circumstances in which licensee is given the right to sell any of the Trademarked Products) or otherwise transferred, to a person other than a person whose sales would be attributed to NBI under 2(a) above, then at Squibb's request NBI will continue to make payments to Squibb during the remainder of the Payment Term with respect to any such U.S. Trademark (or if the business is sold, with respect to all U.S. Trademarks relating to such business) with the amount of each payment for such U.S. Trademark to be equal to [sic] the net U.S. sales of Trademarked Products bearing such U.S. Trademark or Trademarks during 1981. * * *
The use of the words "equal to" rather than "based on" was a drafting error and did not reflect the intention of the parties. This error was contained in the first draft of the trademark agreement and was not corrected.↩
10. Sec. 2(d) of the trademark agreement provides: "(d) NBI will furnish Squibb with annual reports as to net sales for which payments are to be made, which reports will be accompanied by a certificate by an NBI financial officer certifying the report's accuracy."↩
11. Sales were below the 33-percent level for Supradent, Sweet Nothings, and Sour Bites in 1982, Replay gum in 1983, and Pine Bros. candy and Life Savers Sours in 1984.↩
12. Cannibalization can occur when a manufacturer introduces a new product similar to an existing one, thus leading consumers to buy the new product. For example, Breath Savers took business from Life Savers candy.↩
13. If sales had continued at 1981 levels, petitioner would have paid $ 28,208,000.↩
14. After concessions, $ 4,192,420 remains in dispute for both of the years 1982 and 1983. If these amounts are disallowed under sec. 1253(d)↩, the parties agree that $ 640,840 is deductible under sec. 483 for both 1982 and 1983.
15. Petitioner deducted $ 5,562,189 for 1982 and $ 5,603,544 for 1983. In the years before the Court, respondent no longer challenges petitioner's deduction of $ 1,369,769 for 1982 and $ 1,411,124 for 1983.↩
16. Sec. 1253(d) provides: (d) Treatment of Payments by Transferee. -- (1) Contingent payments. -- Amounts paid or incurred during the taxable year on account of a * * * sale * * * of a * * * trademark * * * which are contingent on the productivity, use, or disposition of the * * * trademark * * * transferred shall be allowed as a deduction under section 162(a) * * * (2) Other payments. -- If a transfer of a * * * trademark * * * is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction -- (A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year * * *; (B) in the case of a payment which is one of a series of approximately equal payments made in discharge of such principal sum, which are payable over -- (i) the period of the transfer agreement, * * *
in the taxable year in which the payment is made * * *.↩
17. Sec. 1253(a)↩ provides: "(a) General Rule. -- A transfer of a * * * trademark * * * shall not be treated as a sale or exchange * * * if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the * * * trademark".
18. Respondent contends that payments on about $ 89.4 million (one-third of 1981 sales) were guaranteed, and that $ 1,692,420 of each annual payment from 1982 to 1986 and $ 1,406,184 of each annual payment from 1987 to 1991 was noncontingent. Respondent concedes that the annual payments in excess of these amounts were contingent. Thus, respondent concedes that petitioner's payments of $ 1,369,769 in 1982 and $ 1,411,124 in 1983 were contingent. The contingent portions are deductible under sec. 162(a). Sec. 1253(d)(1)↩.
19. Sec. 1253(b)(2)(F) provides: (b) Definitions. -- For purposes of this section -- (2) Significant power, right, or continuing interest. -- The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred: (F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.↩
20. On July 15, 1971, respondent proposed regulations that provided that contingent payments are a substantial element under section 1253(b)(2)(F) if, at the time the parties enter into the transfer agreement, the contingent payments are estimated by the parties to the agreement to be more than 50 percent of the total estimated consideration for the transferred property. Sec. 1.1253-2(d)(6), Proposed Income Tax Regs., 36 Fed. Reg. 13148, 13151 (July 15, 1971). These proposed regulations were never adopted and were withdrawn on Apr. 27, 1993, 58 Fed. Reg. 25587, corrected 59 Fed. Reg. 13470↩ (Mar. 22, 1994).
21. The estimated annual payments were about $ 28,208,000 and the estimated total payments were about $ 53,208,000. Respondent concedes that contingent payments were about $ 13,250,000 (about 25 percent of $ 53,208,000). Total payments for 1982 and 1983 were $ 11,165,733. Respondent concedes that $ 2,780,893 (24.9 percent) of this amount was contingent. See note 18.↩
22. "Substantial" is defined in percentage terms in sec. 507(d)(2)(A) (2 percent); sec. 6109(g) (5 percent); sec. 2036(c)(3)(A) (prior to repeal by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11601(a), 104 Stat. 1388-490) (10 percent); sec. 6662(d)(1)(A)(i) (10 percent); sec. 751(d)(1) (10 percent and 20 percent); sec. 147(c)(2)(E)(i) (15 percent); sec. 42(d)(2)(D)(i)(II) (25 percent); sec. 6229(c)(2) (25 percent); sec. 6501(e) (25 percent); sec. 382(1)(4)(B)(i) (33 percent); sec. 1.279-3(c)(2), Income Tax Regs. (5 percent); sec. 1.1237-1(c)(3)(ii), Income Tax Regs. (10 percent); sec. 1.7704-2(c), Income Tax Regs. (15 percent); sec. 301.7701-15(b)(2)(ii), Proced. & Admin. Regs. (20 percent); sec. 1.6043-3(d)(1)(i), Income Tax Regs.↩ (25 percent).
23. See Baldwin v. Emigrant Indus. Sav. Bank, 150 F.2d 524, 525 (2d Cir. 1945); Gangi v. D.A. Schulte, Inc., 150 F.2d 694, 696-697↩ (2d Cir. 1945) (substantial number of tenants engaged in production of goods for commerce where at least 20 percent of building was occupied by tenants so engaged).